# HOWARD M. KELLER et al. *vs.* MARY E. GILL et al.

### *Deed Obtained by Fraud of Grantees Annulled.*

Shortly before his death, an old man, in ill-health, was induced to leave his home where he had lived with a grandchild, and go to the house of one of his daughters. There, two weeks before his death, he executed a deed to his two daughters, who were present, conveying to them his real estate, practically his entire property, upon an expressed consideration of $2,300. Upon a bill by the grantor's grandchildren, the children of a deceased son and daughter, to vacate the deed for fraud, it was shown that the alleged money consideration was not accounted for by the defendants who administered upon their father's estate; that they had obtained possession of and suppressed his will, by which a distributive share of his estate was given to the grandchildren, and the defendants failed to testify in the case or deny the charges of fraud. *Held*, that the deed was obtained by fraud and should be annulled.

Appeal from a decree of the Circuit Court for Carroll County (Reifsnider, J.)

The cause was argued before McSherry, C. J., Fowler, Page, Boyd, Pearce and Schmucker, JJ.

*James A. C. Bond* and *Francis Neal Parke* for the appellants.

*D. N. Henning* for the appellees.

McSherry, C. J., delivered the opinion of the Court:

The bill of complaint filed in this case on June sixteenth, eighteen hundred and ninety-nine, assails the validity of a deed of conveyance made by a certain Henry H. Keller to his two daughters, who, with their husbands, are the appellees on the record now before us. The plaintiffs below, who are the appellants here, are three granddaughters and one grandson of the grantor. The deed bears date May the twelfth, eighteen hundred and ninety-nine, and was filed for record three days later. On the thirtieth of May, or just eighteen days after

the deed had been executed, Henry Keller died. The deed conveyed to the two daughters all the real estate that Keller owned; and the inventories filed in the Orphans' Court since his death show that he was worth but seventeen dollars and a half in personal property. The grounds upon which this conveyance is attacked are, *first*, mental incapacity on the part of the grantor; and *secondly*, fraud on the part of the grantees.

Whilst there is not sufficient evidence to establish a lack of mental capacity, though there are circumstances which indicate that Keller had but an imperfect comprehension of the contents of the deed, the whole atmosphere surrounding the transaction is filled with unmistakable signs of fraud. Upon looking through the record and scrutinizing the conduct of the beneficiaries under the deed, and after giving to the undisputed facts their appropriate probative value, it is impossible to escape the conviction that these grandchildren were made the victims of a scheme devised by the grantees and imposed upon the grantor with the selfish view of acquiring all his property under the sham and the guise of a conveyance founded on a pretended valuable consideration. Fraud is always more or less masked. The most bungling, no less than the most adroit perpetrator of it, seeks to hide the evidence of his handiwork, and to give to the result accomplished the semblance and the outward show of honesty. The more skilful the agent, the more difficult the detection. But in almost every instance there is unwittingly left some trivial clue which leads to discovery, or the thing done is so far at variance with what ought naturally to have been expected that it can by no reasonable explanation be referable to any other cause, though the precise steps taken to reach the end achieved may not be readily traced.

To get a proper view of the situation with which we are now dealing we must go back a few years and ascertain the surroundings of the parties. Keller had four children—a son and three daughters—at least the record shows no others. The son died some twenty-two years ago, leaving two infant children, one a boy the other a girl, and they, now past their

majority, are two of the plaintiffs in the case. One of the three daughters died about fourteen years ago, leaving two daughters and they are, with their husbands, the other plaintiffs in the case. The grandson lived with his grandfather for nearly twenty-two years, and when the grandson married he took the grandfather's house in Manchester, Carroll County, and the grandfather occupied a room therein until a few weeks prior to his death. Some two or three years before Keller died his wife departed this life. She left an estate of a few thousand dollars. This, or at least a part of this, seems to have been invested in promissory notes payable to her. Of these notes, one for between nine hundred and a thousand dollars, was made by Susan Eckenrode and her husband, two of the appellees ; one for between eight hundred and a thousand dollars was made by Mary E. Gill, another appellee ; and one for one hundred and twenty-three dollars was made by Howard M. Keller, one of the appellants. These notes, together with a will which Keller had executed, were kept by him in his secretary in his room at Manchester. It does not appear whether the wife's estate was her statutory separate estate or not, but the notes were not reduced into possession by Keller in the life-time of his wife and they belong to her estate upon which no administration has ever been taken out. Some two or three weeks before Keller died he was induced by one of the grantees in the deed, namely, Mrs. Gill, to go from his home in Manchester, to her house, about nine miles distant in Baltimore County. At that time Keller was in bad health. After he reached Mrs. Gill's house he was attacked with cramp colic to which it seems he had been subject, and he took to his bed. He appears never to have rallied or to have left his bed again. Shortly after he had gone to Mrs. Gill's, and whilst he was in a physically weak condition, Mrs. Eckenrode, another of the grantees in the deed, called upon Mr. Baltozer, a magistrate living in Manchester, and asked him to prepare a deed from her father conveying his property to her and her sister, Mrs. Gill. At her request Mr. Baltozer went to the house of Mrs. Gill the same day, and upon enter-

ing the room where Keller was in bed, this is what took place :
" I went in," said the witness Baltozer, " and spoke to Mr. Kel-
ler and he said he wanted me to write a deed, he wanted to
deed his property to his two daughters.   I asked him what
was to be the consideration named in the deed, he said two
thousand dollars for the property in town, two hundred for
one lot and one hundred and fifty for another lot ; I said then
that will make two thousand, three hundred and fifty dollars
for all.   I then went down stairs and prepared the deed. After
the deed was prepared I took it upstairs for Mr. Keller to
sign.   He sat up in bed and wrote his name."   The acknowl-
edgment was taken before R. Hooper Gill, the husband of
one of the grantees.   Mrs. Eckenrode was in the house dur-
ing this time, having gone there from her home in Manches-
ter, after she had sent Mr. Baltozer to Mrs. Gill's.   No money
was paid by the grantees in the presence of the draftsman of
the deed, and though Keller never left the house alive and is
not shown to have spent a dollar during the remaining eigh-
teen days of his life, not a cent of this alleged consideration
has been accounted for by his administratrices, who are the
grantees in the deed.   If they ever paid the consideration they
have come into possession of it again and they have failed to
make a return of it as part of the assets of his estate.   Their
failure to make a return of it is strong evidence until explained
that they never paid a penny of it.

In a few days after the deed had been executed, by means
of which the two daughters procured a title to the whole of
their father's real estate, the son-in-law Gill, with the aid of
Mrs. Eckenrode, removed from Keller's house in Manchester
and took to the house of Mrs. Gill, Keller's bed-room furni-
ture, including the secretary containing the notes and will.
By this act they obtained possession of all the personal prop-
erty he had except the trifling articles enumerated in an in-
ventory filed in the Orphans' Court and aggregating in value
the sum of seventeen dollars and fifty cents.   By the same act
they obtained possession of the will and of the notes due by
them to Mrs. Keller's estate.   Within two weeks after Keller's

death, letters of administration upon his estate were granted
by the Orphans' Court of Carroll County to Mr. and Mrs.
Gill and Mr. and Mrs. Eckenrode. They have made a return
of two inventories; one a list of desperate debts amounting
to three hundred and twenty-five dollars and fifty-five cents,
and the other a schedule of personal property amounting, as
just stated, to seventeen dollars and fifty cents. Having thus
possessed themselves of practically every thing that Keller
owned, it is charged in the bill of complaint that the deed is
wholly without legal consideration, is fraudulent and void.
The defendants in their answer deny the fraud alleged and de-
clare that Keller executed the deed "with full mental and
physical capacity to make a valid deed and was influenced
alone by what he, of his own free will, believed to be an act
of justice for consideration received from the parties benefited
and to make a free and a proper disposition of his property."

If the conveyance was the result of an honest transaction,
and was founded upon a valuable consideration as it purports
upon its face to be, what has become of the twenty-three hun-
dred and fifty dollars? It is neither pretended nor intimated
that Keller spent a dollar of it, and it is morally certain that
he did not receive it. If he received it at all it has since gone
back into the hands of the administratrices, who are the per-
sons that paid it, if it ever was paid; and they have not ac-
counted for it. They do not allege in their answer that they
did pay the money, and though charged with fraud in procur-
ing the deed and confronted in the evidence by the facts
already stated, not one of them ventured to go upon the wit-
ness stand to make any explanation whatever. They induced
Keller to leave his home; they placed him, sick and debili-
tated, where he was wholly under their dominion and away
from contact with his grandchildren and his life-long neigh-
bors; and then when near his end they obtained from him a
conveyance of all his real estate upon a consideration pro-
fessing to be valuable, but which in fact was simulated. At
the moment the deed was signed one of the grantees asked
the draftsman of it if he thought it was necessary for the doc-

tor, who was then in the house, to remain as a witness to the deed "so that if anything should arise as to his mental condition he could certify as to it." This was a singular inquiry if the transaction was a real and not a feigned purchase of the property. They have not denied that they obtained possession of his will, though they were present before the examiner when the evidence was given which showed that they carried away his secretary that contained the will and though notified to produce the will. They have not denied that they obtained possession of the notes which evidenced the sums they owed Keller's wife, though they were aware that they were charged with purloining them when Keller was helpless and dying. In the face of these grave accusations supported in their hearing by evidence they remained absolutely silent. If these accusations were false, if this inculpatory evidence was untrue, why did they fail to testify? Silence under such circumstances is little less than a formal confession of guilt, and a Court of equity cannot be expected to say that the charges are unfounded or that the evidence is untrue, when there is nothing in the record to refute either and when the parties charged with the fraud have failed to repel it by their own testimony. *Hiss* v. *Weik*, 78 Md. 439; *Zimmerman* v. *Bitner*, 79 Md. 128; *Berger* v. *Bullock*, 85 Md. 443.

The fact that these appellees obtained all of Keller's real estate and practically all of his personal property just before his death, stands out prominently in the case, and has not been disputed or questioned or explained. No reason has been suggested to account for this conduct. There is nothing to warrant the assumption that Keller intended to disinherit his grandchildren. On the contrary, there is evidence that he declared before he fell under the dominion of the appellees, that those grandchildren should have the respective shares of his estate to which their deceased parents would have been entitled had they been living; and this was the disposition made in his missing will. He was on perfectly friendly and cordial terms with those grandchildren and no motive has been disclosed for a sudden and radical change in his feelings

towards them.    It is clear he did not design to make a *gift* of the real estate to the two daughters.    Every circumstance negatives such a pretence.    If he intended them to have the property at all, he intended to *sell* it to them for its actual value, and he equally intended that they should pay for it the price which he fixed.    He did fix a price upon each of the three parcels conveyed by the deed, as is shown by the testimony of Mr. Baltozer, and he evidently expected the purchase-money to take the place of the land and to pass under the terms of his will, because by the will the land was directed to be sold and the proceeds were bequeathed to his daughters and his grandchildren.    But the scheme of the appellees contemplated and brought about a different outcome.    They secured the deed, they paid nothing for the land, though professing to purchase it for a valuable consideration, they got possession of and suppressed the will, they made away with the notes due by themselves to Mrs. Keller's estate, and after his death they became the administratrices of his estate and filed no return of assets, save the ones mentioned, because they had absorbed everything of value that he owned.    The result accomplished and the method employed to effect it— so far as that method can be traced—clearly indicate the purpose or intent with which they did what was done.    It is impossible to ascribe to an honest purpose a result so obviously inequitable and unjust.    These appellees manifestly intended to do what they did do.    They must be held accountable for the natural and inevitable consequences of the things which they deliberately did, and they must be treated as having intended to accomplish just what they did accomplish.    When called on to answer for this conduct they stand mute and give no explanation.    Can it be doubted for a moment that they are guilty of the fraud charged?    Can a Court of equity under these circumstances say that the assailed transaction was fair and honest, when the actors themselves refuse to declare that their conduct was free from the taint of fraud?    The duty was on them to make an explanation and their failure to do so must be regarded as equivalent to a declaration that the infer-

ence of fraud deducible from their conduct is the only correct inference that can be drawn.

We need go no farther in this discussion. The case made by the bill so far as the allegation that the deed was procured by fraud is concerned, is fully proved—as fully proved as if the appellees had gone upon the witness stand and confessed the truth of the accusation against them. It thence follows that the deed which has been attacked must be stricken down and as this conclusion is the opposite of that reached by the Court below its decree against which the pending appeal was taken, must be reversed and the cause must be remanded to the end that a new decree conforming to this opinion may be passed.

*Decree reversed with costs above and · below, and cause remanded.*

(Decided December 13, 1900.)