(75 Misc. Rep. 98.)

## In re McGERRY'S ESTATE.

(Surrogate's Court, New York County.  December, 1911.)

1. DESCENT AND DISTRIBUTION (§ 71*)—PROOF OF HEIRSHIP.

One claiming a distributive share in the personal estate of decedent must establish his consanguinity by evidence, and admissions are insufficient.

[Ed. Note.—For other cases, see Descent and Distribution, Cent. Dig §§ 229–236;  Dec. Dig. § 71.*]

2. DESCENT AND DISTRIBUTION (§ 71*)—EVIDENCE OF HEIRSHIP.

On an issue of consanguinity, the court may inspect the parties and consider physiological resemblances as corroborative of other competent evidence.

[Ed. Note.—For other cases, see Descent and Distribution, Cent. Dig. §§ 229–236;  Dec. Dig. § 71.*]

In the Matter of the Estate of Mary McGerry.  Application for compulsory accounting of administratrix.  Decree for administratrix.

Thomas H. Smith, for claimant.

Edward McGerry and Charles A. Sullivan, for administratrix.

Charles T. Terry and Mr. McMahon, for sureties of the administratrix.

FOWLER, S.  This matter comes before the surrogate on an application of Edward McGerry, claiming to be the brother of Mary McGerry, deceased, for a compulsory account of the proceedings of Jennie A. McGerry (now Mrs. Culloo) as administratrix of her sister, Mary McGerry, deceased.

The administratrix resists the application, and insists that she is the sole surviving sister and only next of kin and heir at law of Mary McGerry, deceased, and that the petitioner, Edward McGerry, is not the brother of Mary McGerry, deceased, or of the administratrix, and that he, therefore, has no title to the account sought, or to any distributive share of the estate of Mary McGerry, deceased.

The inquiry of the surrogate reduces itself to a single issue of fact:  Is, or is not, Edward McGerry the brother of the intestate, Mary McGerry, and of the administratrix, Jennie?  The estate is not large, but the gravity and importance of the issue to the parties and their posterity has extended the inquiry over many sessions of my court, and yet, notwithstanding the mass of testimony taken, the proofs are not nearly so far-reaching as the surrogate could wish, for no commissions to take depositions in Ireland, the birthplace of the disputants, have been taken out, and consequently the evidence offered rests wholly on the testimony of such witnesses as were accessible in this jurisdiction, and were sworn before me.  The counsel for Edward McGerry, the claimant, has not even submitted a brief to me on the extended testimony, as he was unable to secure a copy of the stenographic minutes of the proceedings in this court;  his client, the claimant, being too poor to defray the expenses thereof

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

and to take out commissions to Ireland. This situation compels me to give the matter the closest attention, in order that the omissions mentioned may not operate to the undue prejudice of the claimant, Edward McGerry, or those who are concerned with the res judicata.

It is no easy matter for me to sift for myself, from the extended evidence offered on the hearing, that which is really important to the issue. No pedigree or family chart whatever has been offered by the claimant in evidence, and almost all the testimony bearing on his family history and its organization is in dispute. Even the relationship of the claimant's witnesses who give testimony on pedigree is involved in denials. In other words, their right to give any such evidence is denied. The family or families of both claimant and deceased were in what is called the humbler walk of life in their native land, and they were pursued by poverty, which disrupted the family or families, and forced many of the members to emigrate, one by one, from Ireland. Consequently nearly all the data usually adduced in inquiries of this kind are wholly lacking here, and on many points of importance I am unassisted by claimant's counsel; but I shall not neglect the inquiry.

The common-law rules applicable to issues of this character have been formulated generally in those great causes which involve successions to honors or dignities rather than to estates. But such rules are not for that reason wholly irrelevant to the lesser cause before me. It is a truism of political philosophy that the rules of the common law are most often formulated in great cases, and at the expense of those who can best afford it. This is an advantage to the people at large. Titles to disputed estates only are usually tried in ordinary ejectment proceedings. Disputed successions to personal property, on the other hand, usually arise in this court or in like courts, where it is sometimes said, by respectable authorities, that in property cases the rules of evidence are less strict than in cases involving disputed successions to dignities. But this statement of law I take leave to doubt. There is not at common law one rule of evidence for people of station and another for people of none. I shall therefore assume that the parties to this controversy cannot affect the rights of third persons by their mere admissions concerning a family status. The rules applicable in this court—on questions of pedigree —are strikingly like the rules applied on disputed successions to dignities, because both are founded on equitable applications of legal rules. I take it to be also an established rule that a person cannot be made a member of a family by his mere assertion. Doe v. Randall, 2 M. & P. 22; Blackburn v. Crawford, 3 Wall. 175, 189, 18 L. Ed. 186. It is for such reasons that the uncorroborated assertion of the claimant that he is a brother of the deceased, and the denial under oath of the administratrix amount to nothing of weight on the real issue. They leave it just where it started.

[1] Nor are the admissions of the parties here of great consequence. Admissions are treated as substantive evidence only in some cases, and then on a principle analogous to estoppels in pais. I am not unaware of the great difficulties of proving heirship or of the civil

law maxim, "Filiatio non potest probari," adopted by Lord Coke and Lord Nottingham, or of the loose rules of evidence which sometimes spring from the recognition of that maxim in cases of this character. But in this court it is essential, in disputed successions to personalty of an intestate, that the claimant shall set forth in the proofs all the facts which constitute the consanguinity claimed. Admissions are not enough on such an issue as this, or where rights of third persons are concerned. See Shane Barony, Minn. Ev. 1830, pt. 2, p. 35; Id. pt. 3, p. 6. It was in view of some such general theory of law that it formerly was held that in cases of this character a party had no right to see the position of the adverse party, until he had first set out his own pedigree. Rutherford v. Maule, 4 Hagg. 238; Hibben v. Calemberg, 1 Lee, 655. While this rule of procedure no longer obtains, its justice remains apparent. Otherwise, by a simple process of adoption or absorption, a claimant might falsely color the issue.

The burden of making out and sustaining his claim to be a brother of deceased and the administratrix (for there is no doubt, I think, that Mary and Jennie McGerry were sisters of the whole blood) is, in any event, on Edward McGerry, the claimant. This burden involves the necessity of showing in detail a common origin and a common kindred. If the claimant on such an issue as this, and whether it be to a title of dignity, or to an estate, real or personal, small or large, does not make out his pretensions by solid proofs, he must fail. Chandos Barony, and Berkely Earldom, both cited in Hubback's Evidence of Succession (Ed. 1845) p. 87; Adams, Eject. (3d Ed.) 281; Id. (1st Am. Ed.) 28; Tyler, Eject. 560; Dyer, 79a; 2 Saund. 45a.

Unfortunately this is not a mere case of the disputed identity of a claimant, such as was the well-known case of the Tichborne claimant. Fundamentally this cause is even more complex than the Tichborne Case. This is a case where it is denied that there ever was such a son as the claimant born to the alleged common parents. This poor cause is in this respect rather nearer to the Annesley claim to the estate of Lord Anglesea, which I ventured to call to the attention of counsel on the trial, and which occupied for 15 days the Irish Court of Exchequer in the year 1743. 17 Howell St. Tr. 1140. With this general reference to some of the principles and sources of law controlling the surrogate in this tribunal, we may now proceed to the consideration of the evidence adduced, and now before me for my final consideration, reserving particular points of evidence and their legal effect to be discussed in connection with the testimony of the several witnesses.

I shall proceed first to consider the claimant's own affirmative story, and contrast that with the affirmative story of the administratrix. The claimant testified that he was born at Duncannon, County Wexford, Ireland, in August, 1886. This would make him at present some 25 years of age. It is allowable to testify to one's own age (Koester v. Rochester Candy Works, 194 N. Y. 92, 87 N. E. 77, 19 L. R. A. [N. S.] 783, 16 Ann. Cas. 589); but, though no objection was taken, I doubted whether the claimant could testify to his christening when an infant. He states that his father's name was John Mc-

·Gerry, and that his mother's maiden name was Ellen Melican. The father of the deceased and of the administratrix was also named John McGerry, and their mother is asserted to be Nora Ellen Melican. But the claimant states that the immediate family of his parents con·sisted of his father, his mother, the deceased "sister" Mary (the in‧testate), and two other "sisters," Maria and Jennie, the administratrix here, besides two brothers, John and David, both dead, making a family of six children. The administratrix asserts that her immediate ‧family consisted only of her parents, the deceased sister Mary, herself and one brother, John, now dead, and that she herself is now .26 years old. The claimant insists that his "dead sister" Mary (the intestate) was born in England, and that "his sister" Jennie (the administratrix) was born in Duncannon, County Wexford, Ireland. Both the claimant and the administratrix state that their father, or fathers, died in their early youth. The administratrix swears that her mother died in Ireland, and is buried in County Clare, but the ·claimant insists that his mother, shortly after the father's death, emigrated to America in his youth, and that she went to Buffalo, N. Y., and there remarried. Whether she is alive he does not know. The ·claimant swears that his father was in the British army, and I think that the administratrix by her testimony to the effect that her family ‧before going to the East Indies was "stationed" in the County Kerry .admits enough to enable me to infer that her father was in the army, although she stated that she was told his occupation when he first came to County Clare was that of an assistant teacher in a school. This last may be quite true. I think I may infer that John McGerry, the father of the administratrix, was a petty officer, as he took his ·existing family with him to India. He might have been on his return competent to teach a country school of some kind. Later on in her ‧testimony the administratrix, however, swears that her father was never in the army. This she could not know of her own knowledge. I should think it likely from the fact that the father of Mary and Jennie went to India and was "stationed" in Ireland that he was in the army. The term "stationed" connotes this. Besides, people of their class otherwise would hardly have gone to India temporarily; the journey being so costly. But this is a mere inference of mine, and I will not rely upon it. Such are some of the points of identity in the pedigrees informally set forth by the claimant and by the administratrix.

It appears that the claimant after the death of his father went for .a week to stop in Kilrush, County Clare, with Mrs. Harris, his maternal aunt, and then he went to his grandfather, John Melican, who lived in Scattery Isle, County Clare. The claimant lived with his grandfather until he was 10 years of age. Then he returned to live with his aunt, Mrs. Harris, until he was 15 years old, meanwhile attending the National Schools of Ireland. At 15 years of age the ·claimant, having finished school, went to sea as a deck hand, and there‧after he enlisted in the British navy and served seven years. Then .again he resumed the merchant's service, and in 1906 he claims to have seen the deceased sister Mary, who was then a servant in an American family, sojourning temporarily in an hotel in London, Eng-

land. To all this the claimant himself testifies. Many of these things neither the claimant nor the administratrix could know of their own knowledge. They were susceptible of corroboration by Irish witnesses, but no commissions were issued and the evidence on the whole case is most inartificial and unsatisfactory. Finally, in 1907 or 1908, the claimant landed in this city. Mary McGerry, the intestate, died on the 21st of February, 1908. The claimant did not see her after his arrival. The claimant states that he looked up his "sister" Jennie (the administratrix) after he came to New York, and that she told him Mary was then in the country. This she denies absolutely.

While all these things were transpiring with Edward, Jennie McGerry, the administratrix, according to her own story, after her father's death went to live with a grandaunt, Mrs. John Corbitt (born Julia Brennen). Mrs. Corbitt was an aunt of the mother of Jennie. With Mrs. Corbitt Jennie lived until she was 18 years of age. Mrs. Corbitt lived in Killballyown, County Clare, Ireland, and there Jennie went to the National School. When 18 years of age she emigrated to this country, where Mary, the intestate, had preceded her. Mary was long a domestic in the family of a gentleman of this city by the name of Steers, who gave his testimony on the stand. It was during such service that Mary acquired the estate of which she died intestate. Mary was older than Jennie by some years, although little exact evidence is given on this point. But she must have been so, as she was in India with her father before Jennie's birth, and in domestic service in this country before Jennie's arrival. For 10 years apparently, while the claimant was living in Kilrush, or Scattery Island, County Clare, Jennie was living 20 miles away in Killballyown in the same county. Yet they never met but once, according to the claimant's story, when he was 16 and Jennie 15 years of age. This meeting he says was at Kilrush. Jennie denies that she ever saw the claimant before the death of her sister Mary and his advent to this country, and she swears on the stand that the meeting at Kilrush never took place. Mrs. Corbett, or Corbitt, the grandaunt with whom Jennie lived in Ireland, was living there at the time of the trial, and the question arose before me whether her declaration relating to matters of pedigree was competent. The surrogate on the authority of Young v. Shulenberg, 165 N. Y. 385, 388, 59 N. E. 135, 80 Am. St. Rep. 730, admitted Mrs. Corbitt's declaration that the mother of Jennie and Mary was dead. In the case just cited it is stated that such declarations are competent when the declarant is "beyond the jurisdiction of the court," consequently Mrs. Corbitt's declaration that Jennie was an orphan and had only one sister, Mary, and one brother, John (deceased), was also admitted. Similar declarations of Mary McGerry, the intestate, were proven by Mr. Steers, her longtime employer, and were clearly competent evidence, being the declarations of one deceased. Washington v. Bank for Savings, 171 N. Y. 166, 63 N. E. 831, 89 Am. St. Rep. 800. In receiving Mrs. Corbitt's declarations, as she was alive in Ireland, I confess that I was controlled by the opinion I have cited, rather than by what I have otherwise regarded as the rule, viz., that the declarant must be dead, or pre-

sumptively dead, by reason of absence, in order to justify the acceptance of such declarations. Whart. Ev. § 215; Taylor, Ev. § 645; Wigmore, Ev. § 1481; Jones, Ev. § 318; McKelvey, Ev. 271; Hubback, Suc. 660. And see particularly Butler v. Viscount Mountgarret, 1859, 7 H. L. Cas. 648. Mrs. Corbitt's declarations made after the beginning of the contention or post litem motam I excluded without any hesitation whatever, as on this point there can be no doubt as to the rule applicable. Declarations made after the controversy arises are certainly not competent.

At first glance, it would seem that the identity of many points in the respective pedigrees of the claimant and the contestant was very significant. But, in so far as such identity concerns the claimant's case, it has no legal significance whatever, unless supported by other evidence than his own testimony. The mere assertion of a claimant that he has generally the same relations as contestant does not strengthen his disputed assertion that he is of the same parentage. I shall now briefly glance over the testimony.

Testimony on the part of claimant was given in before the surrogate by several witnesses living in New York, but natives of Ireland. Nora Behan, a young woman aged 28 years, testified that she was a native of County Clare, and that witness' mother was the sister of Jennie's mother. She testifies that the claimant and Jennie are brother and sister; that she went to school with Jennie in Ireland and to the same village church; and that Mary, the intestate, came to this country with Mary's mother. She also testifies that she knew the claimant in Ireland, but that she never saw Jennie and claimant together in Ireland. The testimony of this witness as to general reputation of the neighborhood concerning the relationship of the claimant and Jennie is not adequate. It is no doubt true that to some extent general reputation is regarded as competent evidence on some questions of pedigree. In 1790 (3 T. R. 709) Mr. Justice Grose said "that a pedigree may be proved by general reputation," and in the Annesley Case proof of reputation was allowed in order to establish that the disputed son, Richard Annesley, was in fact the son of Lord Altham. Such evidence is also competent in cases involving adulterine bastardy. But in any case such evidence is admissible only when no superior evidence is attainable. Whart. Ev. § 205, and cases there cited. In any event, this witness was incompetent to prove general reputation of the claimant's neighborhood. Her neighborhood was not that of the claimant. The administratrix does not concede, indeed, that the witness Nora Behan is a first or any other degree of cousin. Certainly it is significant that this witness never claimed the relationship with Jennie after coming to New York. The witness testifies, besides, to much that she could not know of herself. The witness never saw the claimant and Jennie together in Ireland. She never saw the claimant in this country until three months before the trial; and before that she had not seen him for many years. In that time the claimant had grown from a child to a man. There were so many discrepancies in the statements of this witness as to entitle her testimony to little conclusive weight. She had evidently persuaded herself of the claimant's rights, and she be-

lieved in his assertions. This is not enough to entitle her to speak with authority on these disputed points.

Mrs. Nora Mulvaney, called for contestant and claiming to be a distant cousin of the intestate and Jennie, the administratrix, deposed that she is a third cousin of both. This fact also is denied by the administratrix. This witness had once lived in Scattery Island, Ireland, where the claimant also says he lived in his youth. She swears that she remembered claimant's mother, and that she had six children. She states that she saw Jennie once when the latter was a little girl in Ireland, and that such child is now the adult administratrix, and that the claimant is her brother. But Mrs. Mulvaney saw the mother of claimant only once when that Mrs. McGerry was about coming to this country, and then this witness was a young child. The witness came to this country 11 years since, and never saw Mrs. McGerry afterward. The story of this witness agrees with the claimant's as to the number of children of his mother. The witness states that Mrs. McGerry left all her six children, including Mary, the intestate, Jennie, the administratrix, and the claimant, behind her in Ireland; that that Mrs. McGerry came to this country, settled in Buffalo, and remarried. The witness came to this country 11 years since. Assuming this last fact to be true, the claimant was then but 14 years of age and Mary and Jennie were children. Witness never saw claimant again, she says, until 5 years ago, when she was employed in the Grand Central Hotel, and he called to see her. The difficulty here is that the claimant was not then in this country, and, had he called on witness 5 years ago, it would have been difficult for the witness to recognize in the man the boy of 14 she last saw in Ireland many years before. That this witness is persuaded that the intestate and claimant were brother and sister is not enough. Her testimony lacks the proper foundation to enable her to speak with authority. It is quite true that in the Tichborne Case witnesses were allowed to swear to the identity of the defendant, either affirmatively or negatively, but their reasons were given in great detail, and they were subjected to the most rigorous cross-examination in the annals of judicial trials. The very slight cross-examination in this case before me sufficed to disclose that the conclusions of this witness and of the other witnesses on identity were unwarranted. I do not say that the witnesses themselves did not believe in their conclusions, but, like all opinions offered in evidence in this court, opinions on identity must be extremely well founded to have weight. See cases cited, Ram on Facts, 430.

The testimony of Mrs. Galvin, from Scattery Isle originally, came to nothing of consequence, excepting that she was a native of County Clare, and that "McGerry" or "McGarry" is a very common name in County Clare. From this testimony of importance, inadvertently brought out, I presume that the witness meant that "McGerry" is a frequent surname for various households and families in that part of the country. This, I think, is the fact. It is the name of a "clan" of the countryside. This fact, doubtless, should be considered by me, as it may account for some honest confusion and discrepancies in the testimony. The witness finally admits that most of her knowl-

edge of the claimant's family was learned only after her arrival in this country. She never saw the intestate in this country until after intestate's death, but yet witness went to her "wake." Witness never saw either claimant or Jennie in Ireland. Her intimacy with the family of McGerry in this country seems to date from the "wake."

Much other evidence of the same dubious sort was given in on the hearing. While specious, it was of a totally inconclusive character, and it did not measure up to the standard of legal requirement. It is therefore quite needless for me to review it all in detail.

Much importance was at first attached to the fact that the claimant at times spelled his name "McGarry," but this was met by evidence that the administratrix probably did the same, although she denies her signature in the application for her marriage license taken out in this city. But I think too much attention in this cause is not to be paid to this trifling variation. It does not of itself disprove the claim of the claimant to be of the family of the intestate, in view of the fact that Jennie, the administratrix, probably made the same variation in the spelling of her own family name. Indeed, it is possible that persons using the surname of "McGerry" spelled in indifferently or at different times with an "e" or "a" as the individual humor dictated. This is frequently the habit with individuals of a tribal or clannish name, and of itself proves nothing. Hubback, Ev. of Suc. 452 et seq.

There are far too many discrepancies in the testimony in this cause. One of the chief of them relates to the identity of the mother of the claimant and the mother of the intestate. The claimant's mother is alive, or at least is not proved to be dead, but the mother of the intestate and of her sister Jennie, the administratrix, is I am satisfied from the proofs, dead, and I believe she died in Ireland. The strong family and filial affection of Irish families is notorious and admirable. The intestate and Jennie evidently believed the declarations given in evidence of the death in Ireland of their mother, and their entire life and conduct from their youth up were consistent with that belief, and that belief only. Their entire lives conform to the belief that they had no mother and but one brother, John, who had been long dead. The declarations of the intestate to the effect that she had no near relatives besides Jennie are clearly proved by the competent testimony of the employer of the intestate, and he was an entirely disinterested witness and had employed intestate for many years.

Both the intestate and Jennie, the administratrix, were respectable women of their class, and their conduct apparently blameless. Had they a mother or brother living, I have no doubt from the tenor of their lives, that their conduct toward such existing relations would have been exemplary. But, in fact, both lived the lives of brotherless orphans, and that they so believed themselves to be I cannot entertain a doubt. The life of the claimant, on the other hand, does not seem to me to be consistent with his assertion of brotherhood. To be sure, he was a sailor man of roving life, and he claims to have gone to visit his sister, the intestate, during her visit to London. But the letter he produces from her to corroborate it is not sufficiently

established, nor is the alleged photograph of her, which he produces as a gift from her, sufficiently identified. Indeed, the likeness to intestate is controverted. It is highly significant to me that Mr. Steers, the employer of Mary, was not asked if the alleged photograph was that of the intestate. The interview between claimant and intestate in London, England, rests on his unsupported assertion, backed by a disputed letter and a disputed photograph. The claimant could write, and he admits that he knew where the intestate lived in New York, yet there is no evidence that he ever wrote a line to either Mary or Jennie, or communicated with them in any way. His first visit to Jennie in this country was only subsequently to the intestate's death, when he came to claim his inheritance. Such claim was, of course, immediately repudiated. The witnesses who, he says, put him on the scent of the inheritance, were not produced before me. It does seem to me that the claimant's assertion of brotherhood with two young women, nearly his own age, and alone in a strange land, was, to say the least, belated and careless. Such claim bears some marks of inherent improbability. The claimant's conduct during his entire life does not seem to me consistent with such a close relationship as he now puts forth.

Had there been any evidence offered which tended to show that the claimant had ever lived in the same family circle with the two young women whom he now claims to be his sisters, or that he had ever, or at any time, been treated by them as their brother, such evidence would have had weight. But there was none such. Even during their respective youths in Ireland, in the same countryside, there is no competent evidence that claimant and intestate or Jennie ever stood in the acknowledged relationship of brother and sisters. During the long residence of the young women in this country there is no one fact established which tends to show any existence of such a relationship, except the claimant's assertion of a visit to the intestate while she was in London on a tour with the family of her employer. That the claimant then did visit intestate stands solely on his own assertion, of course, under oath. But the curious sequel of such alleged visit is that thereafter no further intercourse ever again took place between Mary and claimant. This seems to me most unnatural. Family conduct, such as the tacit recognition of relationship, is often very cogent in causes involving disputed relationships. Taylor, Ev. § 649. But in this case there is an absence of proof of any such conduct on the part of the two sisters. In Mary's lifetime the claimant showed no sign of fraternal existence. Only after the death of the intestate was such sign made. This conduct, to say the least, was unnatural, and its result on claimant's claim is certainly now unfortunate for him. This is the penalty he must bear for his unnatural conduct, even if his present assertion is true. Such conduct was held quite relevant in the Tichborne Case, and claimant's preference for the Orton family rather than for the Tichborne family significant in that case.

[2] Having briefly considered the effect of the oral and documentary features of the evidence before me, I must pass to the third and

rather unusual species of evidence offered to me by the claimant in support of his pretensions. It is of the kind classified by unauthorized writers on evidence as real evidence, or evidence by inspection of objects actually produced in court. Such inspection is generally permitted on trials by jury or in pais, and there is no valid reason why the rules of this court should be different on this point during the progress of trials of issues of fact by the surrogate. The evidence of the senses is immediate and cogent, and it would be unnatural to exclude it from consideration here. People v. Gardner, 144 N. Y. 119, 38 N. E. 1003, 28 L. R. A. 699, 43 Am. St. Rep. 741; Cowley v. People, 83 N. Y. 464, 477, 38 Am. St. Rep. 464; King v. New York Central & H. R. R. Co., 72 N. Y. 607; People v. Gonzalez, 35 N. Y. 49. Originally all evidence before a jury was of this character. The weight now to be attached to such evidence is quite another thing.

During the trial the claimant's counsel asked the surrogate to inspect the appearance of the parties to the controversy then in court and to compare them, asserting that the resemblance of claimant to Jennie was so great as to be in itself "real evidence" of the relationship alleged by the claimant. This evidence was objected to by counsel for the administratrix. The surrogate, however, felt obliged to take notice of the offer, and accordingly had the parties draw near and inspected their appearance, and by consent of counsel reserved his decision on the objection taken to this evidence and the effect and weight of such evidence, if evidence it was. I was aware that there were familiar precedents for the course taken by counsel for claimant. In the Douglas Peerage Case (pages 148, 149, House of Lords, 1769), Lord Mansfield allowed the resemblance of the appellant and his brother to Sir John Stewart and Lady Jane Douglas to be shown, as well as their dissimilarity to those persons whose children they were supposed to be, while as late as 1871 the Lord Chief Justice Cockburn, in the Tichborne Case, held that the resemblance of the claimant to a family daguerreotype of Roger Tichborne was relevant, and intimated that comparison of features between the claimant and the sisters of Arthur Orton would be permitted. See Gaunt v. State, 50 N. J. Law, 490, 14 Atl. 600. But it seems to me that conclusive inferences from such inspection are extremely dangerous, and this, I think, seems to be the present opinion of modern English cases bearing on this point. Bagot v. Bagot, L. R. Ir. 308; Morris v. Davies, 5 Cl. & Fin. 204, 205; Burnaby v. Baillie, 58 L. J. Ch. 842; Plowes v. Bossey, 31 L. J. Ch. 682. Standing alone, such unsupported inference from an inspection of an infant to determine who was its father would not, for example, I think, be permitted to support a judgment in a bastardy or filiation case. Such evidence may be perhaps considered as corroborative of other competent evidence given in cases of this character, but nothing more. Very little, if any, weight should, in my judgment, be attached to such physiological evidence in this cause. I confess that I thought I perceived a resemblance in the contours and the features of the parties to the controversy. But my observation in this class of evidence is too limited to permit me to draw any inference from such inspection, or to enable me to regard

the alleged resemblance as proof of contestant's allegation in this cause, in view of the state of the other proofs.

I have given to this cause much and careful consideration, and I must say I have entertained great doubts on some points. But on one point I entertain none—that it is my duty to determine that Edward McGerry, the claimant, has not made out his claim, as he must under the rule which I enunciated at the beginning. It was incumbent on the claimant to prove to me by a preponderance of evidence that he is a brother of the deceased. In cases of this character it is always admissible to find simply that the claimant has not made out his claim. I am not bound by the precedents to find for one party or the other. Such conclusion will then be in the nature of the Scotch verdict of "not proven." For the reasons given by me at the outset, I should feel it quite unjustifiable in this cause to pronounce for a decree which would permit this young stranger to the dead and the living sisters to go away with the money of the deceased, and thus subject the bondsmen of the administratrix to possible loss. I cannot, on the case made, allow him to take this money out of the proper hands of the administratrix. My finding in any event that he was a brother of the deceased would be quite unjustifiable on the evidence before me.

The decree will, accordingly, be against the petitioner and for the administratrix.

Decreed accordingly.