In the Matter of the Estate of MARY U. STRONG, Deceased.

Surrogate's Court, New York County, August 1, 1938.

*Evarts, Choate, Curtin & Leon,* for the petitioner.

*Cadwalader, Wickersham & Taft,* for William Strong Hogan and others, respondents.

*William Anderson Kirk,* for Robert H. Aborn and others, respondents.

*Samuel S. Koenig,* special guardian for Robert W. Aborn and others, infants.

*Dwyer & Redfield,* for Robert E. Thomas, respondent.

*Townsend & Lewis,* for Putnam Bradlee Strong, respondent.

FOLEY, S. The exceptions to the referee's report are overruled and the report is confirmed upon the opinion of Mr. J. F. Connor, the referee. Submit decree on notice settling the account accordingly.

The following is the opinion of the referee:

JEREMIAH F. CONNOR, Referee. In this accounting proceeding the issue is whether Robert E. Thomas, referred to herein as the respondent, is the child of Putman Bradlee Strong and Mary Augusta Strong. Mary Augusta Strong was at one time well known in this country and internationally as an actress, and is frequently referred to herein under her stage name Mae Yohe. Mary Urania Strong, the testatrix, died July 27, 1921. Under her will a part of her estate valued at approximately $160,000 was placed in trust, with the income payable to her son, Putnam Bradlee Strong, during his lifetime, with the remainder payable to his lawful issue, or in default of such issue, to the next of kin of the testatrix. If Robert E. Thomas is the son of Putnam Bradlee Strong, the remainder of the trust passes to him; if not, to the next of kin of Mary U. Strong, represented by Cadwalader, Wickersham & Taft, William Anderson Kirk and the special guardian. Before this accounting was filed, Robert E. Thomas commenced an action in the Supreme Court of New York county naming Putnam Bradlee Strong, " Mae Yohe " and the Central Hanover Bank and Trust Company as defendants. In such action he sought a judgment declaring him to be the lawful son of Mr. Strong and Mae Yohe. The complaint, in referring to his claimed parents, alleges: " *Fifth*. That the said defendants have to divers persons denied the paternity and maternity respectively of the plaintiff. *Sixth*. That the said defendants are the only persons living who have the best and complete knowledge relating to plaintiff's birth and are now both of an advanced age of approximately sixty-four years." Because this action was pending, Robert E. Thomas was made a party in this accounting. He was named in the citation, which was duly served, and appeared by his attorneys, Dwyer & Redfield. Objections were filed by the next of kin of Mary U. Strong alleging that Thomas was not the son of Mr. Strong and not a proper party to the proceeding. A motion by Thomas to dismiss the objections upon the ground that the trust had not terminated and the objections were premature, was denied by the surrogate. (*Matter of Strong*, N. Y. L. J. Nov. 10, 1936, p. 1614.) The matter was then referred to determine the status of respondent Thomas. At the start of the proceedings before me Thomas agreed to try out the issue in this accounting in Surrogate's Court instead of in the Supreme Court action.

Thomas claims that he was born October 1, 1908, and that his mother was Mary Augusta Strong, now Mary Yohe Smuts (Mae Yohe). The respondent was adopted by E. R. Thomas and Rosa M. Thomas, his wife, by an order in the County Court of Multnomah

county in the State of Oregon, on May 5, 1909. His claim of parentage is based principally upon a power of attorney signed by Mary Augusta Strong in the adoption proceeding, in which she represented herself as his mother. Mary Augusta Strong is alive and resides in the State of Massachusetts. Her statement in the adoption proceedings is hearsay. There is also hearsay testimony that she appeared to be and claimed to be pregnant, and exhibited respondent as her just born child. Respondent contends that the hearsay declarations of Mae Yohe are admissible to establish pedigree, and that these declarations prove the respondent to be her child. Putnam Bradlee Strong was the husband of Mae Yohe at the date of respondent's birth, and if it is true that Mae Yohe is respondent's mother, presumptions in law arise that the child is legitimate, and that Putnam Bradlee Strong is the father. When these presumptions exist, neither of the parents may give testimony tending to show that the child was illegitimate, and the alleged father may not give direct testimony to establish non-access to his wife. The rule for the admission of hearsay testimony to establish pedigree is laid down in the leading case (*Aalholm* v. *People,* 211 N. Y. 406) in the following language: " The admissibility of such declarations is subject to three conditions: 1. The declarant must be deceased. 2. They must have been made *ante litem motam, i. e.,* at the time when there was no motive to distort the truth. 3. The declarant must be related either by blood or affinity to the family concerning which he speaks." (See, also, *Matter of Wendel,* 146 Misc. 260; *Matter of Whalen,* Id. 176; *Matter of Wood,* 164 id. 425.) In determining whether these conditions are present in our case I am only considering the evidence of respondent Thomas and discuss them in this inverse order. I believe that " Yohe's " admitted relationship to Strong, coupled with circumstantial evidence of the birth of Thomas, meets condition 3. The decisions are uniform that only slight evidence of relationship is required. As to condition 2 the declarations were made more than twenty-five years ago and are clearly *ante litem motam.* As to condition 1, the declarant Mae Yohe is alive, so that this condition fails, were it not for authority for the admission of hearsay declarations where the declarant, although living, is outside the jurisdiction of the court. (See *Jackson ex dem. Ross* v. *Cooley,* 8 Johns. 128 [1811]; 3 Wigmore on Evidence, [2d ed.] § 1481, subd. 4; *Young* v. *Shulenberg,* 165 N. Y. 385 [1901]; *Matter of McGerry,* 75 Misc. 98 [FOWLER, S., 1911].) Whether the *Young* v. *Shulenberg* case has been overruled by the *Aalholm* case is a mooted question, and whether hearsay is admissible in this case is surrounded with considerable doubt. Here both putative parents are alive. Mr.

Strong is a party herein and has appeared voluntarily and testified. Mae Yohe resides in Boston, Mass., and an attempt to take her testimony through a commissioner has failed. Neither is financially interested in the outcome as it affects the ultimate distribution of the trust estate. I have arrived at the conclusion from all the testimony in the case that the respondent Robert E. Thomas was not born of Mae Yohe, and that Putnam Bradlee Strong is not his father. Nevertheless, under the decisions last above mentioned, and because I believe respondent Thomas to be an innocent victim of circumstances, I receive in evidence the hearsay testimony. I rule also, however, that hearsay declarations of the alleged mother contradicting the declarations made in favor of the respondent are also admissible. (2 Wigmore on Evidence, [2d ed.] §§ 884, 887.) In the latter respect I refer especially to the allegations of Mae Yohe in her divorce proceeding against Putnam Bradlee Strong. In my opinion the divorce proceedings, and also the history of the family relationship between Strong and Mae Yohe, are admissible under *Matter of Findlay* (253 N. Y. 1) as part of the *res gestæ*. In arriving at my conclusions I disregard any direct testimony showing non-access, and I disregard the testimony of Strong as to the physical appearance and habits of his wife during their married life.

Mae Yohe was first married to Lord Hope of England. He divorced her in 1902, naming Putnam Bradlee Strong as the corespondent. Immediately upon receiving word that the divorce had become final, Strong and Mae Yohe were married in South America. This marriage took place in October, 1902. They traveled together, eventually returning to New York city where they separated in the fall of 1905. This is established by the testimony of Strong, and by the allegations of Yohe in the proceedings instituted by her in Clackamas county, Ore., in the year 1910 to secure a divorce. After the separation Strong testified that he left New York and went to the Orient by way of Vancouver. He remained in the Orient and in Europe for five years, returning to the United States in the year 1910. Mae Yohe apparently returned to the stage. Strong never saw his wife again except for one occasion when she was in Yokohama, Japan, during the year 1909. She did not tell him at that time that she had had a child. Strong testified that he first heard of the claim of the respondent after the death of his sister, Mary Strong Shattuck, in 1935, and that he obtained this information through newspaper articles. In the divorce proceeding between Mary Augusta Strong, plaintiff, and Putnam Bradlee Strong, defendant, in a complaint verified March 5, 1910 (more than a year after respondent Thomas was born),

she alleged " that no issue had been born of said marriage," and made the following allegation concerning separation, desertion and abandonment: " That on or about the 27th day of November, 1905 [before Thomas was born], in the city of New York, in the State of New York, defendant wilfully deserted and abandoned the home of and this plaintiff, and ever since said date has lived separate and apart from her, without any cause or reason and against her will and without her consent." These allegations are not binding upon the respondent in this proceeding, but as before stated I hold them admissible under *Matter of Findlay* (*supra*). After the divorce in 1910, at a date which does not appear in this record, Yohe was united in marriage with one referred to herein as Captain Smuts, and she is still his wife.

In the summer of 1908 Mae Yohe was appearing in vaudeville in Portland, Ore., and residing at the Hotel Perkins. The Thomases, who later adopted the respondent, had a drug store in the same building with this hotel. Before moving to Portland she had been on a vaudeville tour through British Columbia. She was known and recognized in Portland as the " well-known actress." After living at the Perkins Hotel for a time she moved to a private house on Northrop street where she engaged a household staff and set up housekeeping. She represented herself as Mrs. James Fellows. This is established by the testimony of Dr. Lamb, and by a statement in her power of attorney in the adoption proceeding, which, before filing, was partly obliterated. James Fellows lived at Vancouver but spent his week-ends with Mae Yohe at Portland, Ore. Whether he paid the expenses of the house on Northrop street does not appear, but it does appear from the testimony of Dr. Lamb that the bills for medical services were sent to and paid by Mr. Fellows. It is admitted that from and after her residence at the house on Northrop street she led people to believe that she was to have a baby. She told her attending physician that she was pregnant and made the same statement to respondent's foster mother and to others. The appearance of her body was such as to lead one to believe that she may have been pregnant. To promote the belief she purchased " baby things." It is definitely established, however, by the testimony of Dr. Lamb and by every understandable circumstance connected with the case that she was not pregnant; that she never gave birth to a child in Portland, Ore.; that Thomas was brought to the house as an infant, and held out as her child for some ulterior motive not disclosed in the testimony. It may have been that she was attempting to deceive Fellows. It may have been that she and Fellows were attempting to deceive some

other person. Soon after she set up her establishment at the Northrop street house she summoned Dr. Harry S. Lamb as her physician to treat her for an intermittent sickness, which had no connection with her alleged pregnancy. On the first or second visit she told Dr. Lamb that she was four months pregnant. He at first was of the impression that she was telling the truth. After treating her for some time and noticing no change in her condition, he advised her to come to his office, which she did, and at that time he made a complete examination and told her that she was not pregnant. She wanted to know what *she* was going to do about it, and he then told her that there was nothing he could do about it. From this time on nothing was said between them about the matter. It is apparent, however, that she kept up the deception with others. About October 1, 1908, and this is the date upon which Thomas alleges that he was born, the doctor was summoned to the Northrop street house by telephone. He was not called as a physician but was informed by Mae Yohe that a baby was to be brought into the house. After he arrived a woman came in and brought with her a baby and left it with Mae Yohe. The doctor was told that the baby was brought from Idaho. The doctor testified that the infant was approximately a week old. No one was present at the time except the woman and child, the doctor and Mae Yohe. Apparently she was still keeping up the deception for the benefit of others because a day or so later a delivery boy was invited into the bedroom and shown the baby. Mrs. Thomas, the foster mother, also appeared and was shown the baby, and was led to believe that Mae Yohe had given birth to the child. She said to Mrs. Thomas, " I don't know what to do with this baby. He is so hungry and all." She then requested Mrs. Thomas to take the child. Two or three days after October first the doctor was summoned again. When he arrived he found Mr. and Mrs. Thomas in the house. On this occasion the baby was taken by the Thomases with the understanding for a later adoption. The doctor was evidently called in as a witness to the fact that the baby had been delivered into the possession of the two people who later became the foster parents. Dr. Lamb testified that while Mae Yohe had a nurse in the house at times, there was no nurse present when the baby was brought in, and no nurse was present when the baby was delivered to Mr. and Mrs. Thomas. He testified that to his knowledge she never had any other doctor, and never gave birth to any child. I reject the contention of respondent's attorneys that the testimony of Dr. Lamb is untrue. I accept his evidence after seeing and observing the witness, and because of all the other facts and circumstances in the case. I

also hold that his testimony was not privileged, and if it was, that the privilege has been waived. My reasons for this ruling are hereinafter set forth. We come now to other facts and circumstances in the case which support the evidence of Dr. Lamb. The fact of birth may be established by a birth certificate, although such certificate is not admissible to establish parentage. In 1908 the law of Oregon, like the law of New York, required the filing of birth certificates and made the failure to do so by the attending physician a misdemeanor. When the boy was about twelve years of age the Thomases made a search for a birth certificate, and before this proceeding was instituted Thomas himself went to Oregon to make a similar search. No birth certificate could be found. Thomas was led to believe that Dr. Lamb was the physician who attended his mother at birth. He called on Dr. Lamb to get information concerning his birth, and also to get information about his birth certificate. Thomas obtained no information as to whether Dr. Lamb was the attending physician, but the doctor told him that he would not find any birth certificate. Even aside from the birth certificate, the fact of childbirth should be an easy matter of proof. Such proof could be supplied by an attending physician, a nurse or a domestic. No such witness was produced nor could any friend or acquaintance be found to give definite testimony that a child was born of Mae Yohe on October 1, 1908. Mr. and Mrs. Thomas continued in possession of the child, conceded to be the respondent herein, and on May 5, 1909, the child was formally adopted. The adoption papers contain many peculiar factors. The petition was made by Mr. and Mrs. Thomas. In it they give the date of birth as September 1, 1908, instead of October first. They represent that " Mary Strong " is the mother and the surviving parent. Mrs. Thomas testified that she considered these facts to be true. The child was then seven months of age. It is certain from the petition that Mae Yohe never represented, and that Mrs. Thomas never considered, Putnam Bradlee Strong as the father of the child. The papers were evidently prepared by an attorney in British Columbia. The only connection of Mary Strong with the adoption was a power of attorney under which she authorized him to act and give her consent to the adoption. This is the exhibit relied upon to establish a *prima facie* case for the respondent. In the power of attorney Mary Strong gives the date of birth as October 1, 1908, represents herself as the mother, and represents that the father is deceased. As before stated, the power of attorney, which is in longhand, at first described her as lately residing at Northrop street, and there known as Mrs. Fellows, which statement was later obliterated.

It was not under oath, but was witnessed by one E. G. Saunders. The strangest feature connected with the adoption proceeding is the fact that the name of the father of the infant is omitted, not only from the petition, not only from the power of attorney signed by Mary Strong, but also in the adoption order itself. It was only a few days after October 1, 1908, that the infant child was delivered to the Thomases, and within a day or so thereafter Mae Yohe resumed her theatrical career. This quick departure would have been impossible had she in fact given birth to a child. The conduct of Mae Yohe, after the child was delivered to Mr. and Mrs. Thomas, was strange and unnatural. It corroborates the testimony of Dr. Lamb that she never gave birth to a child. It indicates a feigned childbirth. She never saw the child thereafter. She was not sufficiently interested to go to Portland when the child was adopted. She never heard about the child again until some twelve years later when Mrs. Thomas met her and had a talk with her. Even then she did not see or ask to see the child. She never saw Thomas nor heard from or communicated with him during his adolescence or after he arrived at manhood. It is no answer to her conduct that she wanted motherhood concealed because she was in the theatrical business. Moreover, such a reason does not excuse her failure to disclose the name of the father, nor her failure to give testimony in the present proceeding. Unwittingly, the respondent stated a self-evident truth when he alleged in effect in the Supreme Court action that Mary Yohe Smuts was one who had the best and complete knowledge relating to his birth. In the early hearings before me it was admitted that her whereabouts could not be ascertained. Later it developed that she resided in Boston, and after being interviewed by the attorney for the respondent an attempt was made, upon respondent's application, to take her testimony through a commissioner. Respondent's attorney was of the opinion that she would be willing to testify if a trip to New York would not be required. The attempt to take the testimony was unsuccessful, although the time of the commissioner was extended. He reported that his attempt to serve her with a subpœna had failed; that she had not stayed at her usual abode, nor appeared at her place of employment, and had stopped her formerly frequent visits to her husband who was then confined to a hospital. It seems inconceivable that she would have refused to testify if she were the mother. Mae Yohe did go back to Portland in 1910 when she obtained her divorce. In this she had the assistance of Dr. Lamb, who recommended the lawyer and who attended the trial and testified to her residence in Portland. He testified before me that her physical appear-

ance, which led him to believe she was pregnant in 1908, was about the same in 1910. Under the law of Oregon the Attorney-General must be made a party to all divorce cases. He was a party in this case and was represented at the trial by the district attorney of the county. Where there is minor issue of a marriage a decree of divorce in Oregon is invalid when it does not provide for maintenance of the child. (*Boon* v. *Boon*, 12 Ore. 437; 8 P. 450.) In her sworn complaint, and undoubtedly in her testimony, she said that she never had a child while married to Putnam Bradlee Strong. Even if the testimony were otherwise and it was established that Mary Augusta Strong was the mother, a finding that Mr. Strong is the father would rest entirely on presumptions, which presumptions, in my opinion, are completely rebutted by the evidence. (See *Matter of Findlay*, 253 N. Y. 1; *Matter of Marcin*, 156 Misc. 14; *Dieterrich* v. *Dieterrich*, 154 id. 714, 717.)

My decision that Mae Yohe is not the mother does not mean that Robert E. Thomas is an illegitimate child. It leaves him with his parentage unknown and presumed to have been born in lawful wedlock. In deciding the case I reject the evidence of the witness Evans that he reminded Putnam Bradlee Strong that Strong had a child somewhere, and that Strong made no reply. The prejudice of Evans against the Strong family and the Shattuck family was plainly evident. His testimony was unreliable, and in the particular above mentioned I disbelieve it entirely. I also reject the testimony of Louise Glover, taken by deposition, wherein, in answer to the interrogatory " What did she state about the child being born to her," she answered, " She said Bradlee Strong was the father." There was no reason why Mae Yohe, if the statement was true, should select this woman and disclose the name of the father when she concealed the information from others, and concealed it in the adoption and the divorce proceedings. This witness, quite evidently, was prompted by over-zealousness to help respondent. My conclusion that Mae Yohe is not the mother of the respondent would be the same if I were to disregard the testimony of Putnam Bradlee Strong, disregard her sworn statements in the divorce action against him, and disregard her statement in the adoption proceedings to the effect that the father of the child was dead.

In considering the testimony of Dr. Lamb I have kept in mind section 352 of the Civil Practice Act, preventing physicians and nurses from disclosing professional information. There is a similar statute in the State of Oregon. In both States the prohibition only applies to information which was necessary to enable the physician to act in his professional capacity, and information

acquired while attending the patient in such capacity. Dr. Lamb was not called in *as a physician* when the child was brought to the Northrop street house by a strange woman and delivered to Mae Yohe, nor was he called in a professional capacity when the same child was delivered into the possession of Mr. and Mrs. Thomas. His testimony as to what he saw and observed on these two occasions is not privileged. The same is true of his testimony that he knew her as Mrs. James Fellows, and that Fellows paid his bills; that no servant and no nurse was present when the baby was brought into the house; that her physical appearance remained the same during the course of his treatments, and was about the same in the year 1910. (See *Patten* v. *United Life & Accident Ins. Assn.*, 133 N. Y. 450; *Klein* v. *Prudential Ins. Co.*, 221 id. 449.) Most of the testimony of Dr. Lamb was received without objection, and this in my opinion was not cured by a subsequent motion to strike out the testimony. (See *Capron* v. *Douglass*, 193 N. Y. 11; *Hoyt* v. *Hoyt*, 112 id. 493.) Much of his testimony considered by me relates to facts which would be plain to any one, and an attending physician may testify to such facts as was pointed out in the *Klein* case (221 N. Y. 449). We also have in this case a situation where the fact of birth is made the issue. Respondent has made allegations in the Supreme Court action and in this proceeding, and the alleged mother has made allegations in her divorce case and in the adoption proceedings concerning this issue of birth. In a situation of this kind, where both the mother and the child have made public statements concerning the matter, it would seem that the privilege of the physician has been waived by both. In this respect the following cases, by analogy, are in point; *McKinney* v. *Grand Street, P. P. & F. R. R. Co.* (104 N. Y. 353); *Capron* v. *Douglass* (193 id. 11); *Hethier* v. *Johns* (233 id. 370). There is also authority for permitting a doctor to give direct evidence as to the parentage of a child. (See *People ex rel. Mendelovich* v. *Abrahams*, 96 App. Div. 27; *Matter of Baird's Estate*, 173 Cal. 617; 160 P. 1078.)

I make the following findings of fact and conclusions of law:

### FINDINGS OF FACT.

1. Robert E. Thomas is not the son of Mary Augusta Strong.
2. Robert E. Thomas is not the son of Putnam Bradlee Strong.

### CONCLUSION OF LAW.

1. Robert E. Thomas is not the child of Putnam Bradlee Strong and Mary Augusta Strong, and has no interest in the trust fund created for the use of Putnam Bradlee Strong under the last will and testament of Mary U. Strong, deceased.