**Margaret P. MURPHY, et al., Appellants,**

v.

**LaShawn J. McCLOUD, et al., Appellees.**

**No. 92–PR–893.**

District of Columbia Court of Appeals.

Argued Jan. 12, 1994.

Decided Dec. 1, 1994.

Gary W. Diamond, for appellants.

Carl G. Rollins, for appellees.

Before FERREN, STEADMAN, and SCHWELB, Associate Judges.

SCHWELB, Associate Judge:

The principal substantive issue in this remarkable probate case is whether the trial judge committed reversible error in finding, in significant part on the basis of a distinctly problematical birth certificate, that plaintiff Mignon K. Cooper is the daughter of George Cooper, the intestate decedent, rather than his sister, and that she is therefore entitled to share in George Cooper's estate. Before we reach that issue, however, we must resolve a jurisdictional question raised by the court, *sua sponte*, following oral argument, namely, whether the trial judge's decision in Mignon Cooper's favor is an appealable final order.

We now hold that the order is appealable and that this court therefore has jurisdiction to entertain the appeal. On the merits, we conclude that although the judge analyzed the difficult human issues in this case in a thoughtful and insightful manner, he failed to some extent to apply correct legal principles in the course of his determination of Mignon Cooper's relationship to the decedent. Accordingly, we remand for further proceedings.

I.

**THE TRIAL COURT PROCEEDINGS**

George Washington Cooper [1] died intestate in May, 1986, as a result of multiple gunshot wounds. On May 30 of that year, in con-

---

1. This was George Cooper's full name. In this opinion, we must refer to the various members of the Cooper family by their given names in order to distinguish between them. For convenience, we generally omit their middle names and initials.

formity with the provisions of D.C.Code § 20–303 (1989), the court granted the initially unopposed petition of Margaret P. Murphy, a daughter of the decedent, to be appointed George Cooper's personal representative.

On December 1, 1986, Mignon Cooper and her own adult daughter, LaShawn J. McCloud, as plaintiffs, filed what they styled as a "Verified Complaint (To Remove Personal Representative)." They named as defendants Ms. Murphy, as well as three other children of George Cooper, namely Ricky Washington Cooper, Georgette Cooper Blocker, and Patricia Cooper. The plaintiffs alleged that Margaret Murphy "is not in any way related to the decedent either by blood, marriage or adoption," and that Ms. Murphy had misrepresented her relationship to the decedent in obtaining her appointment as George Cooper's personal representative. Mignon Cooper and Ms. McCloud further alleged that Mignon Cooper is the "natural daughter" of the decedent, and that Ms. Murphy had "purposely omitted" Mignon Cooper, in the Petition for Probate, from the list of persons having an interest in the estate. The plaintiffs prayed that Ms. Murphy be removed as personal representative, that Ms. McCloud be appointed in her stead,[2] and that Mignon Cooper be declared to be George Cooper's daughter and a person with an interest in his estate.[3]

The defendants filed an answer, verified by each of them, in which, *inter alia,* they denied both the allegation that Mignon Cooper is George Cooper's daughter and the allegation that Margaret Murphy is not. The defendants alleged that "the Verified Complaint contains representations which the plaintiffs know to be reckless and false."

A non-jury trial commenced on March 13, 1992, continued through March 16, 1992, and resumed on April 21, 1992 and again on June 17, 1992. At trial, the plaintiffs did not pursue their allegation that Margaret Murphy is not George Cooper's daughter and introduced no evidence in support of that claim. The trial thus centered on the question whether Mignon Cooper is George Cooper's daughter or his sister. After hearing the evidence, the judge found that Mignon Cooper is George Cooper's daughter. He found that Margaret Murphy is also George Cooper's daughter, and he declined to remove her as personal representative. The defendants filed a timely appeal.

## II.

### JURISDICTION[4]

Appeal was unknown at common law, and in this country "the right of appeal has always been recognized as the creature of statutory enactment ... requiring express provision of law for its existence." *United States ex rel. Brightwood Ry. Co. v. O'Neal,* 10 App.D.C. 205, 244 (1897), *aff'd sub nom. Capital Traction Co. v. Hof,* 174 U.S. 1, 19 S.Ct. 580, 43 L.Ed. 873 (1899). Many states have enacted statutory provisions specifically regulating the right of appeal in probate proceedings. *See* 3 WILLIAM J. BOWE and DOUGLAS H. PARKER, PAGE ON THE LAW OF WILLS, § 26.126, at 271 n. 1 (1961). The District of Columbia has no statute explicitly addressing appellate probate practice, however, and appeals in probate cases are therefore subject to the same statutory limitations as appeals in other civil proceedings.

This court has jurisdiction, *inter alia,* of all final orders and judgments of the Supe-

---

**2.** It is undisputed that Mignon Cooper was ineligible for appointment as personal representative because she has at least one felony conviction. *See* D.C.Code § 20–303(b)(4) (1989). Mignon Cooper testified at her deposition that she has several drug-related convictions, including one for conspiracy to distribute a controlled substance.

**3.** If an intestate decedent leaves children, a brother or sister does not receive any share of the estate. *See* D.C.Code §§ 19–306, –307, –309 (1989).

**4.** We requested supplemental memoranda on the jurisdictional issue because, where a substantial question exists as to this court's subject matter jurisdiction, it is our obligation to raise it, *sua sponte,* even though no party has asked us to consider it. *See Lee v. District of Columbia Bd. of Appeals & Review,* 423 A.2d 210, 215 (D.C.1980); *cf. Tenants of 1255 New Hampshire Ave. v. District of Columbia Rental Hous. Comm'n,* 647 A.2d 70, 75 n. 5 (D.C.1994) (court must deal with jurisdictional issue before addressing merits).

rior Court. D.C.Code § 11–721(a)(1) (1989). Ms. Murphy[5] contends that the trial judge's decision declaring that Mignon Cooper is George Cooper's daughter, and therefore has an interest in his estate, is a final order within the meaning of the statute.[6]

In determining whether the order appealed from in this case is an appealable final order, we must also consider the statutory provisions governing probate practice in the Superior Court. Our statute provides that upon a sufficient request, the Probate Court may direct the institution of a "plenary proceeding," which then proceeds by petition and sworn answer. D.C.Code § 16–3105 (1989). In such a "plenary proceeding," the case proceeds to trial, and "the Probate Court shall give judgment, or decree upon the bill [and] answer." *Id.*, § 16–3106. The court is authorized to enforce its judgment or decree, *inter alia*, by exercise of the contempt power and by attachment and sequestration. *Id.*, §§ 16–3105, –3106, –3107. The court may also issue execution on any judgment. *Id.*, § 16–3112. The "plenary" proceeding thus has most or all of the hallmarks of a conventional lawsuit.

"An order is final only if it disposes of the whole case on its merits, so that the court has nothing remaining to do but to execute the judgment or decree already rendered." *In re Estate of Chuong,* 623 A.2d 1154, 1157 (D.C.1993) (en banc) (internal quotation marks omitted) (quoting *McBryde v. Metropolitan Life Ins. Co.,* 221 A.2d 718, 720 (D.C. 1966)). If the administration of the estate is viewed as a single "whole case," then, for the reasons set forth below, the trial judge's order plainly does not dispose of it in its entirety.

"The approval of the final account shall automatically close the estate, and if the final account so requests and the [c]ourt approves, shall terminate the appointment of the personal representative." D.C.Code § 20–1301 (1989). In the present case, the final account has neither been submitted to the court nor approved, and the administration of the estate is incomplete. Indeed, the identity of the appropriate personal representative—the individual responsible for preparing the final account—was one of the issues presented to the trial court by Mignon Cooper and her daughter. Moreover, the decision that Mignon Cooper is George Cooper's daughter and eligible to inherit from him did not conclusively establish even her own rights, for it did not determine the amount of money or property, if any, that she would ultimately be entitled to receive. The judgment "did not decree the payment of any money, which was the only purpose of the suit. It opened the way to that end, but nothing more." *Benjamin's Heirs v. Dubois,* 118 U.S. 46, 48, 6 S.Ct. 925, 926, 30 L.Ed. 52 (1886); *see also Burtoff v. Burtoff,* 390 A.2d 989, 991 (D.C. 1978). "An order is not final and appealable where the issue of the amount of damages remains for determination." 4 C.J.S. *Appeal and Error* § 85, at 157 (1993).

Ms. Murphy contends, however, that this line of authority is not controlling because the litigation regarding Mignon Cooper's relationship to the decedent should be viewed as a separate "whole" case, distinct from the administration of the estate. Her counsel puts it this way in his supplemental memorandum:

> There is a clear delineation between adversary proceedings in estate cases and the process of usual estate administration. In the one instance there are disputed questions of law and fact requiring court intervention. On the other hand, the orderly process of probate is controlled by filing and time procedures supervised by the Office of the Register of Wills.

Appellants contend that the adjudication of any complaint litigated pursuant to Su-

---

**5.** Ms. Murphy and the other appellants are represented by the same attorney and have taken identical positions in this appeal. References in this opinion to Ms. Murphy's contentions thus apply to all appellants.

**6.** In the alternative, Ms. Murphy claims that the order appealed from is an appealable collateral order under the doctrine of *Cohen v. Beneficial Indus. Loan Corp.,* 337 U.S. 541, 546, 69 S.Ct. 1221, 1225, 93 L.Ed. 1528 (1949); *see also United Methodist Church v. White,* 571 A.2d 790, 792 (D.C.1990); D.C.Code § 11–721(a). In light of our disposition of this appeal, we do not reach that question.

perior Court Probate Rule 107[7] would be appealable to this Court when final. This rule provides for procedures leading to trial which directly track those applicable in the Civil Division of Superior Court. The contested issues raised pursuant to this rule are completely independent from orderly estate administration. However, the resolution of such disputes directly impacts on the identity of heirs and their shares of any distributions. Accordingly, appellate review must occur as a prerequisite to a final accounting.

Ms. Murphy contends that the appealability of the judge's determination that Mignon Cooper is entitled to an interest in George Cooper's estate is established by this court's decision in *In re Estate of Glover,* 470 A.2d 743 (D.C.1983). In *Glover,* a man alleged that he was the decedent's out-of-wedlock son, and claimed that he had been improperly excluded from participation in the probate proceedings. He brought an action against the personal representative, asking that he be declared the decedent's son and thus a party with an interest in the estate. The trial court dismissed the action on the ground that such a proceeding must be brought during the decedent's lifetime. On appeal, this court considered this issue on the merits and reversed the trial court's decision. Ms. Murphy contends that the court exercised appellate jurisdiction, that it therefore must have had jurisdiction, and that "there is no principled distinction between the appealability of the judgment in *Glover* and the finality of the ruling in the present case."

There is no indication in *Glover,* however, that any jurisdictional question was raised. "Questions which merely lurk in the record, neither brought to the attention of the court nor ruled upon, are not to be considered as having been so decided as to constitute precedents." *Webster v. Fall,* 266 U.S. 507, 511, 45 S.Ct. 148, 149, 69 L.Ed. 411 (1925); *see also Thompson v. United States,* 546 A.2d 414, 423 n. 14 (D.C.1988) (quoting *Webster*). "The rule of *stare decisis* is never properly invoked unless in the decision put forward as precedent the judicial mind has been applied to and passed upon the precise question."

*Fletcher v. Scott,* 201 Minn. 609, 277 N.W. 270, 272 (1938) (citations omitted). "A point of law merely assumed in an opinion, not discussed, is not authoritative." *In re Stegall,* 865 F.2d 140, 142 (7th Cir.1989). Moreover, we are dealing here with a jurisdictional issue, and "when questions of jurisdiction have been passed on in prior decisions *sub silentio,* this Court has never considered itself bound when a subsequent case finally brings the jurisdictional issue before us." *Hagans v. Lavine,* 415 U.S. 528, 533 n. 5, 94 S.Ct. 1372, 1377 n. 5, 39 L.Ed.2d 577 (1974).

No case law from other jurisdictions has been cited to us, and our own research has disclosed none, that is directly on point. A few cases are somewhat helpful by analogy. In *In re Estate of Berger,* 185 Neb. 702, 178 N.W.2d 585 (1970), the Supreme Court of Nebraska held that "[a] decree determining the heirs and the right of descent of real and personal property is by statute declared to be *a final order* and, unless appealed from, is binding and conclusive." *Id.* 178 N.W.2d at 587 (emphasis added). Similarly, in *In re Estate of Jerrido,* 339 So.2d 237 (Fla.App. 4th Dist.1976), an order adjudicating the appellant to be the decedent's common law wife was held to be "*a final order* subject to plenary appeal" pursuant to the applicable Florida statute. *Id.* at 239 (emphasis added). In *In re Estate of Hutchins,* 120 Ill.App.3d 1084, 76 Ill.Dec. 556, 557, 458 N.E.2d 1356, 1357 (4th Dist.1984), the court held that, under the applicable Illinois statute, an order entered in the administration of an estate which finally determined the status of a party was appealable as of right. In *Wheeling Dollar Sav. & Trust Co. v. Singer,* 162 W.Va. 502, 250 S.E.2d 369, 372 (1979), on the other hand, an order declaring that the claimant was not the decedent's child was deemed not to be final or appealable; a later decree ordering the distribution of the principal of a testamentary trust, however, was held to be a final order. Collectively, these decisions lend a measure of support for the proposition that contested litigation as to the status of an heir is conceptually separate from the day-to-day administration of an estate, that an order disposing of such litigation is "final" for pur-

---

7. Rule 107 implements the provisions of D.C.Code § 16–3101, *et seq.*

poses of appeal, and that it would be impracticable to view the administrative process as some kind of "umbrella" lawsuit which deprives an order such as the one here at issue of the requisite finality.

Although the statutory provisions governing proceedings in the Superior Court's Probate Division, *see* D.C.Code § 16–3101, *et seq.*, do not deal expressly with appeals, we conclude that they also lend support to Ms. Murphy's position. They contemplate a "plenary proceeding," § 16–3105, which is terminated by an enforceable judgment. We think it unlikely that the legislature, having invested the trial court with the authority to make and enforce judgments, intended to postpone the initiation of any appellate proceedings until the entire administration of the estate has been completed. We note, in that connection, the following discussion in *Vineyard v. Irvin*, 855 S.W.2d 208 (Texas App.1993):

> A probate order or judgment is final if it conclusively disposes of or is decisive of the issue or controverted question for which that particular part of the proceeding was brought, even if the decision does not fully and finally dispose of the entire probate proceeding. In other words, a probate order is appealable if it finally adjudicates a substantial right; on the other hand, if it merely leads to further hearings on the issue, it is interlocutory.... The probate court conducts its business in a continuing series of events. The nature of "administration" contemplates decisions to be made on which other decisions will be based. There must be a practical way to

review erroneous, controlling, intermediate decisions before the consequences of the error do irreparable injury.

*Id.* at 210 (citations and internal quotation marks omitted).

If Mignon Cooper had instituted an action during the decedent's lifetime to establish that he was her father, *see In re D.M.*, 562 A.2d 618 (D.C.1989), there would surely have been no question that an order declaring her to be his daughter would have been appealable. Although the situation becomes more complex when such a suit is brought within the context of an ongoing probate case, we conclude that the "plenary" paternity proceeding is distinct from the administration of the estate, and that the order determining paternity is therefore appealable as a final order. *Cf. Perry v. Wilson*, 60 App.D.C. 109, 110, 48 F.2d 1021, 1022 (1931) (holding that the removal of the administrator of an intestate decedent was appealable).[8]

## III.

### THE EVIDENCE

The testimony in this case reveals that the matriarch of the Cooper family was "Ma Pearl" Cooper, the mother of George Cooper. According to her obituary, Pearl Cooper was born on July 23, 1903 and died on January 24, 1985. She was survived by a total of 62 linear descendants (including children, grandchildren, and great-grandchildren). It is undisputed that Mignon Cooper was raised as "Ma Pearl's" daughter (and thus as George Cooper's sister), and the trial judge so found. Mignon Cooper contends, howev-

---

**8.** In the present case, Mignon Cooper and her daughter did not cross-appeal from the denial of their request that Ms. Murphy be removed as personal representative. We therefore need not decide whether that denial was appealable by analogy to *Perry*.

In *Richardson v. Reeves*, 34 App.D.C. 9 (1909), Ms. Richardson instituted a proceeding to set aside a will upon the ground of fraud, undue influence, and lack of testamentary capacity. The court framed as a preliminary issue for the jury the question whether Ms. Richardson had been lawfully married to the decedent. The judge ultimately directed a verdict adverse to Ms. Richardson. Ms. Richardson appealed from that order, but the court granted a motion to dismiss the appeal:

> The order appealed from is merely interlocutory, and does not even settle the question of the right of appellant still further to object to the allowance of said will. It is but a step in the proceedings, and, as above stated, by no means puts an end to the controversy between the parties.

*Id.* at 11.

We conclude that *Richardson* is distinguishable from this case because the court's determination as to Ms. Richardson's status disposed of only one issue in the underlying contested litigation. Accordingly, the court did not conclusively determine Ms. Richardson's rights. Here, in contrast, no dispute exists as to the right of Mignon Cooper, if she is indeed the decedent's child, to share in the estate equally with her siblings.

er, that she is in fact Pearl Cooper's *granddaughter* and George Cooper's daughter. The trial court resolved that question in Mignon Cooper's favor.

### A. The Plaintiffs' Case.

At trial, the plaintiffs called LaShawn McCloud, who is Mignon Cooper's daughter and co-plaintiff. Ms. McCloud testified that George Cooper was Mignon Cooper's father, "as her birth certificate states." Although, under the plaintiffs' theory of the case, George Cooper was Ms. McCloud's grandfather, she testified that he had been her "legal guardian" and that he had taken care of Mignon Cooper's children when their mother was incarcerated. Ms. McCloud described George Cooper as being "like a father to us." Ms. McCloud testified that her mother was raised by Pearl Cooper, but she claimed no other personal knowledge of her mother's relationship to Pearl Cooper and George Cooper.

The plaintiffs also introduced a "Certificate of Live Birth" of Mignon Kathleen Cooper. The certificate, signed by George T. Walker, M.D. on October 27, 1947, reflects that Mignon Kathleen Cooper was born on October 21, 1947 at 69 O Street, N.W. in Washington, D.C. The father is identified as George Cooper, aged 35, born in Wilmington, N.C. The mother is identified as Kathleen Hayes Cooper, aged 34, also born in Wilmington, N.C. There is an imperfect circle around the word Cooper, and the judge found that some entries in the document appear to be in different handwriting from other entries. The birth certificate also contains an entry stating that there were three other living children born to the mother. Dr. Walker's certification states that the information for the document was provided by Kathleen [Hayes] Cooper.[9]

At the conclusion of the plaintiffs' case, counsel for the defendants made an oral motion for judgment, noting, *inter alia*, that

Mignon Cooper had not testified on her own behalf and that there were serious discrepancies in the birth certificate. The judge denied the motion without comment.

### B. The Defendants' Case.

Margaret Murphy testified that she is the daughter of George Cooper, and that George Cooper had three other children, namely Georgetta Blocker, Ricky W. Cooper, and Patricia Cooper. She stated that all of the Cooper children knew who their parents were, and that there was no confusion in the family on the subject. She described Pearl Cooper and Mignon Cooper as mother and daughter, and explained that Pearl Cooper was Ms. Murphy's grandmother. According to Ms. Murphy, therefore, Mignon Cooper was not Ms. Murphy's sister but her aunt.

Ms. Murphy testified that she called George Cooper "dad," but that Mignon Cooper addressed him as "George" and that Mignon Cooper's children called him "uncle." She also stated that the Cooper family came from two towns in Duplin County, North Carolina and that, to the best of her knowledge, the Coopers had no relationship to Wilmington, North Carolina. Ms. Murphy's testimony that Mignon Cooper was Pearl Cooper's daughter, George Cooper's sister, and Ms. Murphy's aunt was confirmed by Ms. Murphy's sister, Georgetta Blocker, and by her brother, Ricky Cooper, both of whom also testified for the defense.[10]

Archie Bowman, then seventy years of age, and the stepfather of Margaret Murphy, also testified on behalf of the defendants. He related that he "ran with" George Cooper in the two men's younger days, and that they were "cut buddies." According to Mr. Bowman, Mignon Cooper was Pearl Cooper's daughter and George Cooper's sister. He remembered Kathleen Hayes as one of George Cooper's daughters "outside of marriage." He further recalled, however, that

---

**9.** The judge found that Kathleen Hayes and George Cooper were not married. In this opinion, in order to avoid confusion, we refer to the putative mother as Kathleen Hayes.

**10.** Ms. Blocker further testified that when her own children were born, George Cooper, their

grandfather, would always come to the hospital. He did not do so when Mignon Cooper's children were born. Ms. Blocker's point, presumably, was that this was because Mignon Cooper's children were his nieces or nephews, not his grandchildren.

George Cooper had a relationship with a prostitute named Katherine, or Kitty.

The defense also introduced three significant exhibits. The first was a "Certified Certificate of Birth" for George Washington Cooper, which was authenticated by the Assistant Registrar of Deeds of Duplin County, North Carolina. It appears from this Certificate that George Cooper was born in Duplin County on January 10, 1926, 21 years before Mignon Cooper's birth as reflected in her birth certificate.

The second exhibit was the program for Pearl Cooper's funeral service. The "obituary" which appeared in this program revealed that "Ma Pearl" left five sons, two daughters, forty grandchildren and fifteen great-grandchildren. Mignon Cooper was identified by name in the obituary as one of Pearl Cooper's two daughters, rather than as one of her grandchildren.

The third exhibit was a certificate of death for Pearl Cooper. The document reveals that "Ma Pearl" died at the Washington Hospital Center on January 25, 1984. The document was signed by Robert Ludewig, M.D. and by an undertaker. The informant was described as "Mignon Cooper, Daughter." It therefore appears that, in arranging for Pearl Cooper's funeral, Mignon Cooper represented herself to be "Ma Pearl's" daughter, not her granddaughter.[11]

## C. Rebuttal.

The plaintiffs called Wonzell Cooper, one of Pearl Cooper's sons, as a rebuttal witness.[12] Wonzell Cooper testified that

Mignon Cooper is his niece, seven years his junior. He stated that he knew Kathleen Hayes, and that Ms. Hayes was "large" (apparently meaning pregnant) shortly before Mignon Cooper's birth. He stated that he had never seen Pearl Cooper pregnant. At the time of these observations, Wonzell Cooper was seven years old.

According to Wonzell Cooper, both Mignon Cooper and Kathleen Hayes had told him that the former was the latter's daughter. In response to a question from the judge, the witness added that George Cooper regarded Mignon Cooper as his daughter. Wonzell Cooper testified that George Cooper was about 21 years old when Mignon Cooper was born, and he was unable to explain why her birth certificate described him as 35.

The witness stated that he believed that Kathleen Hayes had died in the late 1960's. He related that he knew no one from the family who came from Wilmington, North Carolina. He acknowledged that he had previously been incarcerated, the last occasion having been at Lorton in "I think it was '70 to '73, somewhere like that, '71 to '73." He said he had also been convicted of armed robbery in the 1960's.[13]

Wonzell Cooper insisted that, if Mignon Cooper were to lose her case, "I'm going to fight this myself."[14] Finally, in a revealing comment, the witness stated that, so far as he knew, there had not been any previous fighting or disputation between Mignon Cooper and the rest of the family, and that

11. The defense also introduced into evidence a purported 1943 birth certificate for Robert Cooper, one of Pearl Cooper's sons, from which most of the required entries are missing and which appears somewhat irregular. The place of birth, like Mignon Cooper's place of birth four years later, is identified as 69 O Street, N.W. There is also the following notation: "Info taken from Affidavit Dated March 7, 1950." Ms. Murphy evidently contends that this exhibit supports an inference that birth certificates in the Cooper family were unreliable.

12. Defense counsel strenuously objected to Wonzell Cooper's testimony, contending that it was not rebuttal. The judge agreed that "it is testimony that really should have been put on in the plaintiffs' case in chief," because "nothing about

the defendants' case ... specifically triggered the need for this witness' testimony that did not exist before." The judge allowed the testimony, however, ruling that there was no prejudice because the defense would be permitted to present surrebuttal.

13. Two of the defense witnesses, Ricky Cooper and Archie Bowman, likewise revealed that they had been incarcerated for serious felonies. George Cooper, who died a violent death, had also spent many years in prison.

14. This remark apparently referred to a dispute over property in Pearl Cooper's estate in which he and Mignon Cooper were aligned on the same side.

I thought we all got along real good, and all of a sudden, this money thing come in here, and everybody started going berserk. I don't know what it was.

### D. Surrebuttal.

On surrebuttal, the defendants introduced portions of the pretrial deposition of Mignon Cooper. The witness had testified, *inter alia*, that Kathleen Hayes had died "about a couple of years ago." Mignon Cooper stated that she had identified herself as Pearl Cooper's daughter on "Ma Pearl's" death certificate, and was so identified in her obituary, because "I signed some papers for her to have the operation, and she raised me, so I looked at her as a mother, more so than anybody else."

The defense also recalled Margaret Murphy and Ricky Cooper. Both witnesses reiterated that Mignon Cooper was "Ma Pearl's" daughter. They both also denied ever having previously heard Wonzell Cooper claim that Mignon Cooper was George Cooper's daughter. In response to questioning by the court, Ms. Murphy testified that George Cooper had associated with a woman named Katherine, or Kitty.

### E. The Judge's Ruling.

Although he expressed the view that "the case reeks with questions" and that "the evidence is sketchy and scanty," the trial judge held that the plaintiffs had proved that Mignon Cooper is George Cooper's daughter. He found that Mignon Cooper, like other principals in the case, was born out of wedlock. He noted that, according to her birth certificate, Mignon Cooper was born at "Ma Pearl's" residence, and that he "cannot accept that Ms. Pearl Cooper would have denied the maternity of anybody; that would have been inconsistent with her very nature, because her very nature is folk maternity."

The judge recognized that there were unexplained discrepancies in the birth certificate, but he nevertheless found that it was "essentially a true document as it related to Mignon's paternity." He noted that Wonzell Cooper and Archie Bowman had testified that there was such a person as Kathleen Hayes,[15] and that the birth certificate, signed by a doctor now dead, would have to be a "complete fraud" if Ms. Hayes was not Mignon Cooper's biological mother. The judge also pointed out that no other birth certificate for Mignon Cooper had been produced by the defense.

The judge recognized that "throughout their lives, as people knew them, and as they regarded themselves, apparently in discussions with other people ... [Mignon Cooper] was [George Cooper's] sister." Nevertheless, attempting to reconcile this finding with the birth certificate, the judge found as follows:

[I]t seems to me that Kathleen was her mother, and she was a person, Kathleen Hayes, and her mother was not Mrs. Pearl Cooper; that is, *her biological mother* was not Ms. Pearl Cooper. Her mother, in fact, was Ms. Pearl Cooper, because Ms. Pearl Cooper raised her almost from birth, if not from birth.

Finally, the judge found that "[Mignon Cooper's] biological father is Mr. George Washington Cooper."

## IV.

### LEGAL DISCUSSION

#### A. The Standard of Review.

■ "Findings of fact, whether based on oral or documentary evidence, shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge the credibility of the witnesses." Super.Ct.Civ.R. 52(a).[16] A finding is clearly erroneous "when, although

15. The judge apparently disregarded defense counsel's reminder that, according to Mr. Bowman, Ms. Hayes was George Cooper's *daughter* out of wedlock, not his wife or mistress.

16. Although this case was tried in the Superior Court's Probate Division, which has no express

analogue to Civil Rule 52(a), we nevertheless apply the "clearly erroneous" doctrine. *See* D.C.Code § 17–305(a) (1989); *Vereen v. Clayborne,* 623 A.2d 1190, 1192 (D.C.1993) (holding that the standard under § 17–305(a) is equivalent to the "clearly erroneous" standard).

there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *United States v. United States Gypsum Co.*, 333 U.S. 364, 395, 68 S.Ct. 525, 542, 92 L.Ed. 746 (1948). In spite of the strictures of the "clearly erroneous" rule, we will not sustain findings in which the trial court has "reject[ed] or fail[ed] to draw the inferences which we [find] inescapable from the record as a whole." *Alexander v. National Farmers Org.*, 687 F.2d 1173, 1203 (8th Cir.1982), *cert. denied*, 461 U.S. 937, 103 S.Ct. 2108, 77 L.Ed.2d 313 (1983). Moreover, "findings induced by, or resulting from, a misapprehension of controlling substantive [legal] principles lose the insulation of F.R.Civ.P. 52(a), and a judgment based thereon cannot stand." *Davis v. Parkhill Goodloe Co.*, 302 F.2d 489, 491 (5th Cir.1962); *see also United States v. Singer Mfg. Co.*, 374 U.S. 174, 194 n. 9, 83 S.Ct. 1773, 1784 n. 9, 10 L.Ed.2d 823 (1963).

Ms. Murphy contends that the trial judge's decision is undermined by significant errors of law. First, she contends that the judge's factual findings in Mignon Cooper's favor were induced by a misapprehension as to the burden the law imposes on an individual who seeks to qualify as one of a decedent's heirs, but who failed to claim, until after the decedent's death, a relationship with the decedent which would qualify her to participate in the estate. Second, she claims that the judge erroneously accorded decisive weight to what she regards as a seriously flawed birth certificate. Finally, she asserts that the judge failed to attach appropriate legal significance to Mignon Cooper's failure to testify in a case in which she had been accused, in effect, of making a fraudulent claim, and in which she could also reasonably be expected to be familiar with critical material facts. We consider each contention in turn.

### B. *The Substantive Standard.*

Although it is now alleged on Mignon Cooper's behalf, in a proceeding initiated after George Cooper's death, that George Cooper was Mignon Cooper's father, there is no evidence that any such claim was made, by her or for her, during George Cooper's life-

time. Death has now sealed George Cooper's lips, and he is no longer in a position to contest Mignon Cooper's claim. Mignon Cooper's purpose in alleging paternity was to enable her to inherit from George Cooper and thus to obtain a financial benefit from the claimed relationship. Courts have long recognized that such claims, made when the decedent is no longer available to rebut them, raise the specter of fraud, and therefore require close judicial scrutiny.

For obvious reasons, claims of paternity are easier to fabricate (and more difficult to contest) than claims of maternity. Where the alleged father is no longer alive, it is especially difficult to determine the truth, and "the possibility of fraud is usually greater with respect to claims against the estate of a deceased man than against the estate of a deceased woman." *Lowell v. Kowalski*, 380 Mass. 663, 405 N.E.2d 135, 140 (1980); *see also C.L.W. v. M.J.*, 254 N.W.2d 446, 450 (N.D.1977).

When a claimant defers an allegation of paternity until after the alleged father's death, she deprives the court of the testimony of a critical and knowledgeable witness. "The father may be expected to have greater personal knowledge than anyone else, save possibly the mother, of the fact or likelihood that he was indeed the natural father." *In re Estate of Lalli*, 43 N.Y.2d 65, 400 N.Y.S.2d 761, 763, 371 N.E.2d 481, 483 (1977) (citations omitted), *aff'd sub nom. Lalli v. Lalli*, 439 U.S. 259, 99 S.Ct. 518, 58 L.Ed.2d 503 (1978). Accordingly, the "availability [of the putative father] should be a substantial factor contributing to the reliability of the fact-finding process." *Lalli v. Lalli, supra*, 439 U.S. at 271, 99 S.Ct. at 526 (plurality opinion) (quoting *In re Estate of Lalli, supra*, 400 N.Y.S.2d at 763, 371 N.E.2d at 483). As Justice Powell explained in *Lalli v. Lalli*,

> [f]raudulent assertions of paternity will be much less likely to succeed, or even to arise, where the proof is put before a court of law at a time when the putative father is available to respond, rather than first brought to light when the distribution of the assets of an estate is in the offing.

439 U.S. at 271–72, 99 S.Ct. at 526 (footnote omitted).

Where, as here, a claimant's delay in alleging the decedent's paternity has rendered important testimony unavailable, courts are bound to take such a circumstance into account. As the court stated in *Estate of Hoffman*, 320 Pa.Super. 113, 466 A.2d 1087, 1089 (1983),

> claims of paternity made after the lips of the alleged father have been sealed by death are in that class of claims which must be subjected to the closest scrutiny and which can be allowed only on strict proof so that injustice will not be done.

The dangers of fraudulent claims against decedents' estates, where the decedent is no longer in a position to refute them, have long been recognized in the District of Columbia. *See, e.g., Duckett v. Duckett*, 77 U.S.App.D.C. 303, 305, 134 F.2d 527, 529 (1943) (discussing Dead Man's Statute); *Coates v. Watts*, 622 A.2d 25, 27 (D.C.1993) (requiring scrutiny of allegations of common law marriage made after death of purported spouse). Prior to this court's decision in *Glover*, it was uncertain whether one claiming to have been born to an intestate decedent out of wedlock may assert an interest in the estate if he or she did not institute paternity proceedings while the putative father was still alive. *Glover, supra*, 470 A.2d at 745. We held in *Glover*, however, that a paternity action need not be brought during the decedent's lifetime, but that "the facts and circumstances establishing parenthood must have come into existence prior to the [putative] father's death." *Id.*, 470 A.2d at 748 (footnote omitted).

With respect to the burden and manner of proof, we concluded in *Glover* that the claimant must establish the decedent's paternity by a preponderance of the evidence. *Id.* at 749; *see* D.C.Code § 16–909 (1989). Section 16–909 creates a presumption of paternity if, *inter alia*, the putative father is or has been married to the mother (or, absent a valid marriage, if some form of marriage ceremony has been performed in apparent compliance with the law). Where, as in this case, the presumption does not apply, the claimant must make an "inferential showing" along the lines set forth in § 16–909. *Id.* at 747. This inquiry, the court held, should

> focus on the relationship that existed between the child born out of wedlock and the putative paternal decedent. Logically includible in the inferential inquiry into the existence of a paternal relationship is whether the putative father held himself out, during his lifetime, to be the parent of the person involved. Logic also dictates that public documents such as birth certificates are to be accorded considerable weight.

*Id.* (footnote omitted). The court further stated that a valid birth certificate is sufficient to establish a *maternal* relationship (as distinguished from a *paternal* one) for purposes of inheritance. *Id.* at n. 8 (citation to legislative history omitted).[17]

Obviously, the statutory "preponderance of the evidence" standard, which was applied in *Glover* to allegations of paternity against an intestate decedent, is a less exacting one than proof by "clear and convincing evidence," which is the standard in some jurisdictions. *See* 14 C.J.S. *Children Out–Of–Wedlock*, § 68, at 355 (1991). The applicability of the "preponderance" standard does not, however, obviate the need for rigorous scrutiny where a party claims the right to inherit from a decedent, but has not asserted the existence of the required relationship with the decedent until after the decedent's death.

In *Coates, supra*, a man who had cohabited for many years with a woman claimed after her death to be her surviving common law husband. In the District of Columbia, common law marriage, like paternity, must be proved by a preponderance of the evidence.

---

17. In his concurring opinion in *Glover*, Judge FERREN expressed the reasonable view that

> for a claimant to show by a preponderance of evidence that paternity has been established he or she will have to demonstrate that the deceased, during his lifetime, openly, notoriously, and unambiguously acknowledged the child as his own. Absent a formal, pre-death determination of paternity, I see no room for a claim-

> ant to prevail solely on the basis of circumstantial evidence that does not include the deceased's unequivocal acknowledgment of paternity.

*Id.* at 751 (internal quotation marks omitted). The majority opinion in *Glover* recognized the importance of such an acknowledgment but did not make it an absolute prerequisite in all cases, no matter what their facts might be.

*Coates,* 622 A.2d at 27. In concluding that the plaintiff had failed to prove the relationship, we held in *Coates* that "claims of common law marriage should be closely scrutinized, especially where one of the purported spouses is deceased and the survivor is asserting such a claim to promote his financial interest." *Id.* (citations omitted). The reasoning of *Coates* applies by analogy to the present case. *See Hoffman, supra,* 466 A.2d at 1089–90 (citing decisions requiring strict scrutiny of common law marriage claims against a decedent as authoritative in case involving a post-death paternity claim against a decedent). In summary, the authorities require the trial court to scrutinize claims such as Mignon Cooper's closely, especially where, as here, no public and unambiguous acknowledgment of paternity was made during the decedent's lifetime.

## C. *The Birth Certificate.*

### (1) *The facts.*

The plaintiffs' case in chief rested almost entirely on Mignon Cooper's birth certificate. LaShawn McCloud asserted during her testimony that Mignon Cooper was George Cooper's daughter simply because the birth certificate said so. She had no other knowledge of the relationship between her mother and the decedent, and she made no claim that George Cooper had acknowledged paternity of Mignon Cooper in her (Ms. McCloud's) presence. Although Wonzell Cooper testified on rebuttal and provided some corroboration for Mignon Cooper's claim, the judge evidently disbelieved at least part of Wonzell Cooper's testimony,[18] and it is evident from his oral decision that he based his judgment in substantial part on the birth certificate.

Perhaps the most significant fact about the dispute over birth certificates is that the plaintiffs introduced into evidence a document which, whatever its shortcomings, indicated that Mignon Cooper was George Cooper's daughter. Ms. Murphy, on the other hand, was unable to produce a birth certificate tending to show that Mignon Cooper was born to "Ma Pearl." Indeed, the defendants failed to come up with any birth certificate for Mignon Cooper at all.

On the record before the court, Mignon Cooper was either the daughter of Kathleen Hayes (as she alleges) or the daughter of Pearl Cooper (as Ms. Murphy contends). If Pearl Cooper was, in fact, Mignon Cooper's mother, then some official documentation of Mignon Cooper's birth to "Ma Pearl" could reasonably be expected to exist. The defendants' inability to produce a birth certificate confirming the existence of a mother-daughter relationship between Pearl Cooper and Mignon Cooper may represent the Achilles heel in the defendants' position. If Pearl Cooper was Mignon Cooper's mother, why is there no birth certificate which says so? If, on the other hand, Kathleen Hayes was Mignon Cooper's mother, there is no basis in the record for concluding that someone other than George Cooper was her father.

Nevertheless, in light of the important role which Mignon Cooper's birth certificate played in the presentation of her case, we must examine it with some care. Dr. Walker certified in the document in question that "the information given was furnished by Kathleen [Hayes], related to this child as mother." The record regarding Ms. Hayes is somewhat sketchy. Wonzell Cooper described her as George Cooper's wife. Archie Bowman stated that Kathleen Hayes was "one of George's daughters, outside of marriage."[19] According to Wonzell Cooper, Kathleen Hayes died in the late 1960's; Mignon Cooper testified at her 1991 deposition that she had seen Kathleen Hayes half a dozen years earlier and that she had died about two years ago.

Kathleen Hayes having been identified in the birth certificate as Dr. Walker's informant, the trustworthiness of the document turns on her reliability. If Dr. Walker's

---

18. Wonzell Cooper claimed that George Cooper and Kathleen Hayes were married and later divorced. No marriage certificate or other proof of a marriage between the two individuals was introduced into evidence during the trial. The judge found that George Cooper and Kathleen Hayes were not married and that Mignon Cooper was born out of wedlock.

19. Mr. Bowman testified, however, that a Katherine, or Kitty, had a relationship with George Cooper.

certificate is accurate, then Ms. Hayes told him that she had three other children "now living." Mignon Cooper testified at her deposition, however, that she knew of only one other child of Kathleen's, a girl. Wonzell Cooper likewise stated that Kathleen Hayes had one other child, a daughter. If Kathleen Hayes was indeed the source of the information in the birth certificate, and if she was truthful, then Mignon Cooper must have two siblings (or half-siblings) of whom she is completely unaware. We cannot say that this is impossible, but it is surely not the usual state of affairs, especially if, as Ms. Murphy testified without contradiction, this was a family in which there was no confusion regarding the relationships between its members.

George Cooper's age is listed on Mignon Cooper's birth certificate as 35. According to his own birth certificate, however, George Cooper was born on March 12, 1926.[20] On October 21, 1947, which is the date of Mignon's birth as reflected in her birth certificate, he was 21 years of age. Accordingly, if Kathleen Hayes provided truthful information to Dr. Walker, she must have been under the false impression that the 21–year–old father of her new baby was fourteen years older than he really was. That, too, is a possible but unlikely scenario.

Mignon Cooper's birth certificate lists the mother's age as 34. If this entry correctly reflects the information which Ms. Hayes provided to Dr. Walker, and if she was telling the truth, then Ms. Hayes was 13 years older than the alleged father of her child, but believed that she was one year younger than he was. With the exception of this entry, there is nothing in the record to suggest that the young George Cooper was involved with a woman 13 years his senior. Presumably, Ms. Hayes knew her own age.

George Cooper's birthplace is identified in Mignon Cooper's birth certificate as Wilmington, North Carolina. There is nothing else in the record to suggest that any member of the Cooper family was connected in any way to Wilmington. That city is in New Hanover County, on the Atlantic coast; the Coopers came from Duplin County, which has an inland location and is a substantial distance to the north of Wilmington.

In *In re Succession of Brown*, 522 So.2d 1382 (La.App.2d Cir.1988), a plaintiff seeking to inherit from a decedent sought to rely on a birth certificate to prove that he was the decedent's son. In that case, as here, there were significant discrepancies in the document. In concluding that the plaintiff's proof was insufficient, the court said:

> The certificate expressly states that the child born is a "girl" and that the child's parents are "lawfully married."
>
> By filing this action asserting that he is the *illegitimate son* of the decedent, plaintiff has effectively conceded that two significant facts recited in the birth certificate are not true. His selective reliance on E.J. Brown's name as the child's father does not satisfy the legal requirements for formal acknowledgment.

*Id.* at 1387 (emphasis in original).

*(2) Legal discussion.*

The entries in Mignon Cooper's birth certificate are technically hearsay or even double hearsay. Dr. Walker certified in the document that the information was provided to him by Kathleen Hayes. Both he and Ms. Hayes are now apparently deceased.[21] Dr. Walker therefore cannot be cross-examined about the circumstances under which Ms. Hayes provided information to him, and Ms. Hayes cannot be cross-examined regarding the trustworthiness of the information which she allegedly furnished to Dr. Walker.

District of Columbia law requires the filing of a birth certificate for each live birth. *See*

---

**20.** The accuracy of his own certificate as correctly reflecting George Cooper's age was not challenged during the trial. Indeed, Wonzell Cooper, the principal substantiating witness for the plaintiffs, estimated George Cooper's age to be the same as that indicated on George Cooper's birth certificate.

**21.** In making his findings, the judge commented, presumably as a matter of personal knowledge, that Dr. Walker is deceased. We are confident that any extrajudicial knowledge the judge may have had of Dr. Walker did not affect his findings. *Cf. Tursio v. United States*, 634 A.2d 1205, 1211 (D.C.1993); *Turman v. United States*, 555 A.2d 1037, 1038 (D.C.1989).

D.C.Code § 6–205 (1989).[22] Because they are prepared pursuant to statute, birth certificates are ordinarily admissible in evidence under a recognized exception to the hearsay rule. *See* Rule 803(9) of the Federal Rules of Evidence; 30 AM.JUR.2d *Evidence,* § 1007, at 140–41 (1967 & Supp. 94).[23] In determining the admissibility of official certificates, courts do not impose a strict requirement of personal knowledge by the certifying officer, lest the practical advantages provided by birth certificates and other similar records be destroyed. *Charleston Nat'l Bank v. Hennessy,* 404 F.2d 539, 541 (5th Cir.1968). Indeed, in *Glover, supra,* as we have seen, this court explicitly contemplated the admission, in controversies over a claimant's relationship to an intestate decedent, of "public documents such as birth certificates." 470 A.2d at 747.[24]

But "[t]rustworthiness, or the lack thereof, is the underlying rationale of the hearsay rule and its exceptions." *Peppers v. Ohio Dep't of Rehabilitation & Correction,* 50 Ohio App.3d 87, 553 N.E.2d 1093, 1094 (1988). These exceptions are appropriate where "circumstances [tend] to establish a statement's trustworthiness notwithstanding that it was made outside the presence of the factfinder." *Mastran v. Urichich,* 37 Ohio St.3d 44, 523 N.E.2d 509, 511 (1988). Where there is reason for suspicion that a document is not what it purports to be, the trial judge, in the exercise of his or her discretion, may exclude it from evidence. *United States v. Kairys,* 782 F.2d 1374, 1379 (7th Cir.), *cert. denied,* 476 U.S. 1153, 106 S.Ct. 2258, 90 L.Ed.2d 703 (1986).[25] "[W]here the circumstances indicate that the statements [in the document] might be unreliable or untrustworthy, the best solution, even if not required, is to place the declarant on the stand and subject [her]

to cross-examination in the presence of the factfinder." *Peppers,* 553 N.E.2d at 1095. In the present case, this solution is not available, for Dr. Walker and Ms. Hayes are no longer alive.

Ms. Murphy does not contest the *admissibility* of Mignon Cooper's birth certificate. To do so would be difficult indeed, especially since she did not specifically argue below that the document was inadmissible. Moreover, the question "[w]hether the contents of the document correctly identify the defendant goes to its weight and is a matter for the trier of fact; it is not relevant to the threshold determination of its admissibility." *Kairys,* 782 F.2d at 1379.

Some of the discrepancies on this birth certificate are of such a character that, in our view, one might plausibly question the presence here of the predicate for the application of any hearsay exception—namely, reasonable assurance of trustworthiness. The doubts which these discrepancies raise as to the reliability of Kathleen Hayes' alleged reportage, as reflected in Mignon Cooper's birth certificate, are compounded by the contradiction between that document (which states that Mignon Cooper is George Cooper's daughter) and Pearl Cooper's death certificate (in which Mignon Cooper is identified as Pearl Cooper's daughter, and thus as George Cooper's sister). Assuming the admissibility of the birth certificate, these problems significantly affect its reliability, and thus its weight, insofar as the question of paternity is concerned.

In some jurisdictions, birth certificates are not admissible to prove paternity because, *inter alia,* "the paternity of an illegitimate

---

**22.** The Vital Records Act of 1981 now provides that if the mother and father were not married at the time either of conception or of birth, the name of the father shall be entered on the certificate only with the written consent of the mother and of the person to be named as the father. *See* D.C.Code § 6–205(e)(3).

**23.** As the Supreme Court of Utah stated in *Bozicevich v. Kenilworth Mercantile Co.,* 58 Utah 458, 199 P. 406, 407 (1921),

[t]he records of births, deaths and marriages, when properly kept as required by law, have, from time immemorial, been recognized as

public records, and, as such, were admissible in evidence for certain purposes.

**24.** *See also Labofish v. Berman,* 60 App.D.C. 397, 399, 55 F.2d 1022, 1024 (1932), in which the court held that death certificates "may be offered in evidence for the purpose of proving, prima facie, the time, place, and cause of death."

**25.** *Kairys* was decided under Rule 901(b)(8) of the Federal Rules of Evidence, relating to ancient documents. We believe, however, that the limited portions of the opinion on which we rely are apropos to the issue here.

child would seem to be a matter not within the personal knowledge of the attending physician." *Woodward v. United States,* 167 F.2d 774, 780 (8th Cir.1948); *see also Steele v. Campbell,* 118 Ind.App. 549, 82 N.E.2d 274, 275 (1948); *In re Strong's Estate,* 168 Misc. 716, 6 N.Y.S.2d 300, 306 (Surrogate Ct. N.Y. County 1938), *aff'd mem.* 256 A.D. 971, 11 N.Y.S.2d 225 (1st Dept.1939). Although personal knowledge on the part of the certifying official is not a precondition for admissibility in the District, his lack of personal knowledge substantially affects the weight to be accorded to the document, especially in light of the doubt that has been cast on the accuracy of Ms. Hayes' other alleged representations to Dr. Walker, and her apparent misinformation about George Cooper's age and place of birth. At least in jurisdictions where proof of a decedent's paternity must be by clear and convincing evidence, even a facially regular birth certificate accompanied by substantial supporting testimony has been held to be insufficient. *See, e.g., Johnson v. Branson,* 228 Va. 65, 319 S.E.2d 735 (1984);[26] *cf. Burnett v. Camden,* 253 Ind. 354, 254 N.E.2d 199, 201 (1970) (requirement that paternity be established by law not satisfied by naming of decedent as father on claimant's birth certificate). Indeed, this court's observation in *Glover* that a birth certificate is sufficient to prove *maternity* at least suggests that such a document, standing alone, would not support a finding of *paternity* by a preponderance of the evidence, especially if it had irregularities such as those in the document presented by Mignon Cooper.

*D. Mignon Cooper's Failure to Testify.*

At trial, counsel for Ms. Murphy repeatedly requested the trial judge to draw an inference unfavorable to the plaintiffs on the basis of Mignon Cooper's absence and failure to testify. The judge declined to do so because

there is no law that I should … draw any adverse inference from … this lady's absence here, or any inference at all.... I don't know why she isn't here, and I'm not going to speculate as to what those reasons are, because there is no evidence to indicate why, actually, why she isn't here. And either party who wanted her to be here, I don't have any doubt but that they could have procured her presence.

Ms. Murphy contends that this was error.

As a general rule, the failure of a party to testify at a civil trial respecting facts and circumstances material to the case which that party is endeavoring to establish, when those facts and circumstances are peculiarly within that party's knowledge, "creates an inference that [s]he refrained from … testifying because the truth, if made to appear, would not aid [her] contention." 31A C.J.S. *Evidence,* § 156(4), at 419–22 (1964 & Supp.1994) (footnotes omitted). The soundness of such an inference has been described as "settled law," and the fact that Mignon Cooper "was available to be called by either side does not bar the application of this rule, as it would if [s]he were a non-party witness." *Fitzpatrick v. Philadelphia Newspapers, Inc.,* 389 Pa.Super. 438, 567 A.2d 684, 687–88 (1989). The inference is not an astonishing or unique one, for "[t]he production of weak evidence when strong is available can lead only to the conclusion that the strong would have been adverse." *Interstate Circuit, Inc. v. United States,* 306 U.S. 208, 226, 59 S.Ct. 467, 474, 83 L.Ed. 610 (1939).

"[T]he mere fact of the party's failure to testify is not of itself open to inference; it is [her] failure when [she] could be a useful and natural witness that is significant." *Brooks v. Daley,* 242 Md. 185, 218 A.2d 184, 189 (1966) (quoting 2 WIGMORE ON EVIDENCE § 289, at 173 (ellipses omitted)). Where a

---

**26.** In *Johnson,* the court held that the claimant (Wise) had not proved that he was the son of the decedent (Compton) in part because

[t]here is no evidence that Compton ever had any contact with Wise. There is no evidence that Wise ever used Compton's surname, or that Compton ever claimed Wise as a dependent for tax purposes. There is no evidence that Compton ever admitted paternity in a court proceeding or in writing under oath.

We hold that the mere listing of Compton's name on the West Virginia birth certificate is insufficient to prove paternity under our statute requiring such proof to be made by clear and convincing evidence.

319 S.E.2d at 737. In the present case, George Cooper had contact with Mignon Cooper, but as her brother, not as her father, and the reasoning in *Johnson* has some application to this case.

party can reasonably be expected to have relevant and helpful information, however, the inference is firmly rooted in human nature. In *Attorney General v. Pelletier,* 240 Mass. 264, 134 N.E. 407 (1922), the Commonwealth's Attorney General instituted proceedings to remove Pelletier, a district attorney, from office for misconduct. Pelletier did not testify, nor did he call any witnesses. The court held that his failure to deny the charges

> warrants inferences unfavorable to the respondent. It is conduct in the nature of an admission. It is evidence against him. This principle of law has long been established and constantly applied. The reason is that it is an attribute of human nature to resent such imputations. In the face of such accusations, men commonly do not remain mute but voice their denials with earnestness, if they can do so with honesty. Culpability alone seals their lips. The law simply recognizes the natural probative force of conduct contrary to that of the ordinary man of integrity.

*Id.* 134 N.E. at 423 (citations omitted).

Various courts have provided different characterizations of the inference to be drawn when a civil litigant fails to take the stand under circumstances in which she might ordinarily be expected to do so. *See, e.g., Brooks, supra,* 218 A.2d at 189 (alluding to "the rule in regard to *permissible* inferences"); *Duratron Corp. v. Republic Stuyvesant Corp.,* 95 N.J.Super. 527, 231 A.2d 854, 856 (App.Div.1967) (referring to "the rule *permitting* adverse inferences"); *but cf. People ex rel. Borelli v. Sain,* 16 Ill.2d 321, 157 N.E.2d 417, 420 (1959) ("relator's failure to testify in his own behalf in a civil proceeding of this type detracts greatly from his position"); *Dunckelman v. T. Baker Smith & Sons, Inc.,* 447 So.2d 26, 29 (La.App. 1st Cir.1984) (party's failure to testify "creates a presumption that his testimony would be damaging to his case"). This court has also spoken in terms of a "presumption." *Namerdy v. Generalcar,* 217 A.2d 109, 112 (D.C. 1966).[27] The United States Court of Ap-

peals, in a pre–1971 case binding on us, *see M.A.P. v. Ryan,* 285 A.2d 310 (D.C.1971), has done the same. *Tendler v. Jaffe,* 92 U.S.App.D.C. 2, 7, 203 F.2d 14, 19 (1953). In *Everett v. Everett,* 170 A.2d 779, 780 (D.C. 1961), we held that a husband's failure to take the stand in a divorce proceeding to explain statements in a letter which appeared to support his wife's contentions "should have given rise to an inference that his testimony would not have been favorable to his own case."

Differences in articulation probably reflect variations in factual context, and we do not take the position that an adverse inference or presumption is mandated in every case. Indeed, in most instances, the inference is a permissive one, committed to the trial judge's sound discretion. *See* 31A C.J.S. *Evidence,* § 156(4), at 419 (1964 & Supp.1994), and authorities there cited. Nevertheless, there are circumstances in which failure to draw such an inference is error. *See, e.g., Everett,* 170 A.2d at 780. In *Chalkley v. Chalkley,* 236 Md. 329, 203 A.2d 877, 879 (1964), the court reversed a judgment because the trial judge had not taken into consideration a party's failure to testify. The court stated that "[w]hen a party to a case refuses to take the stand and testify to the facts peculiarly within her knowledge, *this Court* [*i.e.,* the appellate court] is warranted in drawing an inference that the testimony would be unfavorable." *Id.* 203 A.2d at 879 (emphasis and bracketed phrase added).

The inference is thus one that ought to be drawn where the circumstances are such that a party's failure to testify warrants but one conclusion. *Scribner v. Cyr,* 148 Me. 329, 93 A.2d 126, 128 (1952). As the Supreme Court of Maine explained in an opinion which was rendered in the early days of the Civil War, but which is just as persuasive today,

> [t]here was evidence proving or tending to prove that a notice of demand and nonpayment had been given the defendant. He had been notified to produce it, and did not. He was present and not a witness. If he had never received such a notice, he

---

27. As it was peculiarly within his power to rebut appellee's prima facie case by proving that the signatures were not his, appellant's failure to testify raises a presumption that the evidence would have been unfavorable to his cause. *Id.* at 112.

knew it, and, knowing it, would be little likely to omit an opportunity of stating a fact thus conclusively in his favor. The evidence tended strongly to charge him. A word from his lips might exonerate him from all liability.... The fact of not testifying was obvious to the jury.... *No court could perceive such a fact without attaching some degree of importance— more or less—to its existence, according to the necessity of the testimony and the emergencies of the defence. No judge exists who would not, if the trial had been before him, regard this as a fact bearing on his decision.* To direct a jury to disregard it would be to direct them to disregard a fact existent, material, and probative. However much so directed, they could not fail to perceive, and, perceiving, could not avoid regrading it.

*Union Bank v. Stone*, 50 Me. 595, 599 (1862) (emphasis added), quoted at length in 2 JOHN H. WIGMORE, EVIDENCE, § 289, at 209 (Chadbourn ed. 1979).

The basis for drawing an adverse inference or presumption because a civil litigant did not take the stand is at its zenith when the party who remains silent has been accused of fraud or like conduct. *See Mathews v. O'Donnell*, 289 Mo. 235, 233 S.W. 451, 459 (1921).[28] Indeed, it has been said that "the failure to deny charges of fraud is tantamount to an admission of the truth of those charges." *Brooks, supra*, 218 A.2d at 189 (citing *Berger v. Bullock*, 85 Md. 441, 37 A. 368, 369 (1897)); *see also Keller v. Gill*, 92 Md. 190, 48 A. 69, 71 (1900). The common sense of this proposition is obvious; when a person is accused of being a swindler or a cheat, human nature will ordinarily cause him or her to deny the charge if he or she can forthrightly do so.

- - -

This is not, technically, a fraud case, but it might as well be. Mignon Cooper, who had lived her entire life as Pearl Cooper's daughter, and who had officially so described herself at the time of "Ma Pearl's" death, did not claim during George Cooper's lifetime that he was her father. Her allegation of paternity was made after his death, when a father-daughter relationship would have entitled her to share in his estate. Her adversaries' response was emphatic—they alleged in their answer to the complaint that her allegations were false and that they were known by her to be false. To put Ms. Murphy's position more bluntly, she was contending that Mignon Cooper had fabricated her claim of a father-daughter relationship in order to get her hands on a share of George Cooper's estate.

The accusations in this case went in both directions; Mignon Cooper made similar charges of dishonesty against Ms. Murphy. The reactions of the two sides, however, were strikingly different. Although Mignon Cooper never made any attempt, in court, to support her charges with evidence,[29] Ms. Murphy responded to the accusations against her by taking the stand in her own defense. Mignon Cooper, on the other hand, remained silent in response to Ms. Murphy's implicit charge that she was a cheat and a fraud, and gave no testimony to support her allegations that she was the decedent's daughter and that Ms. Murphy was not.

---

**28.** "The failure of the defendants to testify creates an inference that they refrained because the truth would not aid their contention and affords strong evidence of the fraud charged." *Id.* 233 S.W. at 459.

**29.** The fact that Mignon Cooper made serious allegations against Ms. Murphy in her pleadings but made no attempt to back them up itself supports an inference adverse to her claim.

It has always been understood—the inference, indeed, is one of the simplest in human experience—that a party's *falsehood or other fraud* in the preparation and presentation of his cause, his fabrication or suppression of evidence by bribery or spoliation, and all similar conduct is receivable against him as an indication of his consciousness that his case is a weak or unfounded one; and from that consciousness may be inferred the fact itself of the cause's lack of truth and merit. *The inference thus does not necessarily apply to any specific fact in the cause, but operates, indefinitely though strongly, against the whole mass of alleged facts constituting his cause.*

*Mills v. United States*, 599 A.2d 775, 783–84 (D.C.1991) (quoting II JOHN H. WIGMORE, EVIDENCE § 278, at 133 (Chadbourn ed. 1979)) (emphasis added in *Mills*).

A reasonable person would expect Mignon Cooper to have knowledge of facts relevant to the issue of paternity. If a man regards a woman as his daughter, it would be unusual, to say the least, for the woman not to know that he so regards her, and why. Nevertheless, Mignon Cooper failed to provide the obvious testimony that someone in her position would ordinarily be able to present, namely, that the man whom she now describes as her father ever acknowledged her as his daughter or told her that she was. Margaret Murphy testified that the members of the Cooper family knew how they were related to other members; Mignon Cooper failed to challenge that testimony.

Mignon Cooper was also aware, by the time of the trial, of the apparent infirmities of her birth certificate. If Kathleen Hayes, her putative mother, in fact had three other children, the fourth child would ordinarily be expected to have some information relevant to this fact.[30] Most people would also be able to shed some light on the ages of their parents, when those ages appear to have been erroneously recorded on a birth certificate. Mignon Cooper could explain, if she was Pearl Cooper's granddaughter rather than her daughter, why she (rather than one or more of "Ma Pearl's" children) was the individual making decisions regarding "Ma Pearl's" final illness and death, and why her name appeared on the death certificate as Pearl Cooper's daughter.

It is true that portions of Mignon Cooper's discovery deposition were read into evidence by counsel for Ms. Murphy. To that extent, it was less important for her to take the stand than it would otherwise have been. Taking the case as a whole, however, there was a great deal of evidence unfavorable to Mignon Cooper's claim which Mignon Cooper did not answer. *Cf. Bresnick v. Heath,* 292 Mass. 293, 198 N.E. 175, 177 (1935) ("[m]erely because a party has answered interrogatories may not be enough in all cases to avoid the adverse inference from failure to give testimony on the witness stand"). Moreover, Mignon Cooper's failure to testify in person deprived the judge of the opportunity to hear from her, first-hand, why she believes that the decedent was her father. If the judge's decision had been (or could have been) based on a meaningful assessment of the credibility of the principals on both sides, with each party having the opportunity to cross-examine her adversary, this court would have owed the ruling enhanced deference.

The trial judge declined to draw an adverse inference against Mignon Cooper largely because, as he put it, "I don't know why she isn't here." The duty to explain her failure to testify, however, rested on the plaintiffs. *Cascella v. Jay James Camera Shop, Inc.,* 147 Conn. 337, 160 A.2d 899, 902 (1960). We agree with the judge that it would have been inappropriate for him to speculate on the subject. If an adverse inference was otherwise called for, however, the judge was obliged to apply it unless the plaintiffs established the existence of good and sufficient reasons for Mignon Cooper's decision not to take the stand. *Id.*

Counsel for the plaintiffs relies on decisions by this court relating to the application of the "missing witness" doctrine against defendants in criminal cases. *See, e.g., Dent v. United States,* 404 A.2d 165, 170–71 (D.C. 1979). These cases deal with a problem different from the one presented here. First, they involve non-party witnesses rather than litigants; different principles therefore apply. *See, e.g., Fitzpatrick, supra,* 567 A.2d at 687–88. A party's incentive to clear her name and to deny, if she can, an accusation of fraudulent or immoral conduct, is surely stronger than the motivation to present the testimony of a particular non-party witness. Second, there are considerations, *e.g.,* those relating to the accused's constitutional right to confront adverse witnesses, which make it necessary for courts to be especially cautious in permitting the trier of fact to draw an inference adverse to the defendant in a criminal case. *See, e.g.,* Judge Bell's scholarly opinion for the court in *Hayes v. State,* 57 Md.App. 489, 470 A.2d 1301, 1306–07 (1984).

We do not suggest that Mignon Cooper's failure to testify, standing alone, warranted the entry of judgment in favor of the defen-

---

**30.** There was uncontradicted testimony by Ms. Murphy that in the Cooper family, as in most families, people knew what their relationships were to other members of the family.

dants. Mignon Cooper's claim, however, was one which the court was obliged to scrutinize closely, lest an estate be defrauded because George Cooper is no longer alive to rebut Mignon Cooper's allegations. Because the court was supposed to require strong proof, the claimant's failure to speak on her own behalf takes on added significance. In light of the authorities which we have cited, we are of the opinion that the trial judge's conclusory rejection of any inference adverse to Mignon Cooper was based on a misapprehension of applicable legal principles, and that the judge should at least take a second look.

## V.

## ANALYSIS

■ We now apply the foregoing principles to the record in this case. We note at the outset that the judge's determination that Mignon Cooper is George Cooper's daughter is not without evidence to support it.

Mignon Cooper's mother, as we have noted, was either Pearl Cooper or Kathleen Hayes. There is no support in the record for any third alternative. Although the documentary proof that Kathleen Hayes was the mother is flawed, no birth record whatever was produced to support the defendants' contention that Mignon Cooper was born to "Ma Pearl." Moreover, Mignon Cooper's middle name, as reflected on the birth certificate in evidence, is Kathleen, which was also the first name of Ms. Hayes. This could conceivably be a coincidence, but explanations not based on happenstance tend to be more credible. *See Poulnot v. District of Columbia,* 608 A.2d 134, 139 (D.C.1992).

There is overwhelming evidence, and the trial judge effectively found, that Mignon Cooper was raised as Pearl Cooper's daughter and as George Cooper's sister. Indeed, Mignon Cooper identified herself as "Ma Pearl's" daughter on the family matriarch's death certificate. The judge took this evidence seriously and attempted conscientiously to reconcile it with the information contained in the birth certificate. He concluded that Kathleen Hayes was Mignon Cooper's birth mother, and that Pearl Cooper was her biological grandmother (but her "real" mother, in the sense that she raised Mignon Cooper as her own daughter).

The judge's resolution was a rational and perhaps insightful means of accounting for all of the evidence before him. Moreover, if his finding as to maternity was reasonable, then his conclusion that George Cooper was Mignon Cooper's father was equally rational. If Kathleen Hayes was Mignon Cooper's biological mother, and if Mignon Cooper was born at Pearl Cooper's home, an impartial trier of fact would reasonably conclude that George Cooper was her father. Indeed, if Mignon Cooper was indeed born to Ms. Hayes, then the record is barren of any evidence which would support a finding that someone other than George Cooper was her father. Several witnesses, including Ms. Murphy, agreed that George Cooper had a relationship with a "Kitty," who could very well have been Kathleen Hayes.

The decisive question before us is therefore whether the judge's findings, otherwise unassailable on appellate review, have been impaired or undermined by a misapprehension on his part as to substantive legal principles. We conclude that they have been.

In finding that Mignon Cooper is George Cooper's daughter, the judge acknowledged that "the evidence is sketchy and scanty" and that "the case reeks with questions." The authorities discussed in Part IV B of this opinion simply will not countenance the notion that a claimant, who first alleges that a deceased man is her father after his lips have been sealed by death, can establish paternity, and obtain consequent financial benefits, by presenting "sketchy" or "scanty" evidence. The judge's oral decision does not explicitly reflect the traditional judicial concern regarding the danger of fraud where a claim of paternity has been made against an intestate decedent. The occasion for such a concern is surely at its zenith where, as here, both the claimant and her principal witness have significant criminal backgrounds. There is likewise no indication in the record that the judge took into account the belated timing of Mignon Cooper's claim that George Cooper was her father, or the consequent unavailability of George Cooper's testimony on that

issue. In sum, it does not appear that the judge subjected Mignon Cooper's evidence to the kind of close scrutiny which courts have justifiably applied to protect estates from fabricated claims. Indeed, his reference to "sketchy" and "scanty" evidence suggested that he applied a more permissive approach.

In *Glover*, this court held that one key factor in determining whether paternity had been established is "whether the putative father held himself out, during his lifetime, to be the [claimant's] parent." 470 A.2d at 747. *Cf. id.* at 751 (Ferren, J., concurring) quoted at page 211 n. 17, *supra.* In the present case, there is no evidence that George Cooper publicly acknowledged Mignon Cooper as his daughter,[31] and the trial judge found that Mignon Cooper was raised as "Ma Pearl's" daughter, not as her granddaughter.

We also indicated in *Glover* that, in determining whether paternity had been proved by a preponderance of the evidence, the court should accord considerable weight to "public documents such as birth certificates...." *Id.* at 547. The cases discussed in Part III C of this opinion disclose, however, that courts are reluctant to base a finding of paternity on the identification of the decedent as the father on a birth certificate, where the claim of paternity was first made after the decedent had died. This is particularly true where, as here, the birth certificate has been shown to be inaccurate in other significant respects. Although, as we have noted (and as the trial judge suggested) the proponent's flawed birth certificate may trump the opponent's lack of any birth certificate at all, a document with the irregularities which appear on the face of this one provides, at best, a problematic basis for a finding of paternity.

Finally, Mignon Cooper's failure to testify represents another significant factor in the calculus. The judge's ruling in this case was predicated on the hypothesis that, although Mignon Cooper was raised by Pearl Cooper and regarded in the family as "Ma Pearl's" daughter, she was in fact her granddaughter. The decision therefore rests on an assumption that the Coopers, or some of them, did not know what relationship they had to one another. According to Margaret Murphy, however, members of the Cooper family were well aware of their relationships to other members of the family. If Ms. Murphy's testimony was correct, then the judge's findings rest on an incorrect premise.

If Mignon Cooper had testified, she could have contradicted Ms. Murphy on this critical point. She could have defended herself against the charge that her entire claim was an opportunistic fabrication. She could also have told the court whether George Cooper ever informed her or anyone else that she was his daughter. Under these unusual circumstances, Mignon Cooper's failure to take the stand warranted inclusion in the court's calculus, together with all of the other evidence.

## VI.

## CONCLUSION

For the foregoing reasons, the order appealed from is hereby vacated, and the case is remanded for further proceedings consistent with this opinion.

*So ordered.*[32]

FERREN, Associate Judge, concurring:

Because of the potential for fraud, I continue to believe that, absent a formal procedural determination of paternity, someone who claims to be a child of an intestate decedent, born out of wedlock, cannot establish that relationship by a preponderance of the evidence without "demonstrat[ing] that

---

**31.** Although Wonzell Cooper testified, in response to a question by the judge, that George Cooper told *him* that Mignon Cooper was his (George's) daughter, he did not claim that George Cooper held himself out publicly as Mignon Cooper's father. The only evidence even of a limited acknowledgment of paternity by the decedent was not developed until rebuttal, and even then no question on the point was propounded to Wonzell Cooper by counsel for Mignon Cooper.

**32.** We discern no error on the part of the trial judge in his handling of the attempt by the defense to secure the testimony of Adele Bright Chalmers. On remand, the judge is, of course, free, in the exercise of his discretion, to reopen the record, but he is not required to do so.

the deceased, during his lifetime, openly, notoriously, and unambiguously acknowledged the child as his own." *In re Estate of Glover,* 470 A.2d 743, 751 (D.C.1983) (Ferren, J., concurring); *see ante* note 17. Thus, I agree with reversal and am skeptical, to say the least, that appellees can prevail. I suppose that, contrary to my "bright line" views about such cases expressed in *Glover,* someone could posit facts where a claimant could establish paternity, after the father's death, even though the putative father had not openly acknowledged fatherhood during his lifetime. But, in this case, where the trial judge found that George Cooper's mother, Pearl Cooper, raised Mignon Cooper as her daughter, not as her granddaughter, and where there is no proffered reason (pertaining to Kathleen Hayes or otherwise) as to why George Cooper would not have acknowledged paternity of Mignon Cooper during his lifetime—if it were true—I see no basis for the trial court to find that Mignon Cooper was George Cooper's daughter.